746 F.Supp. 915 (1990)
EUREKA URETHANE, INC., Plaintiff,
v.
PBA, INC. and Professional Bowlers Association of America, Defendants.
No. 88-1026-C-5.
United States District Court, E.D. Missouri, E.D.
September 6, 1990.
*916 *917 *918 James J. Raymond, Thompson & Mitchell, St. Louis, Mo., for plaintiff.
Creighton Miller, Cleveland, Ohio, Payton Smith, Douglas Ross, Davis Wright Tremaine, Seattle, Wash., Robert S. Allen, Lewis, Rice & Fingersh, St. Louis, Mo., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff filed an eight count complaint against defendants which arises out of defendants' refusal to sanction for tournament play a bowling ball manufactured by plaintiff. In Counts I-VII plaintiff alleges that defendants' refusal to sanction violated Section 1 and Section 2 of the Sherman Antitrust Act. In Count VIII plaintiff alleges that defendant is liable for tortious interference with business relations. This cause is before the Court on defendants' *919 motion for summary judgment on Counts I-VII of plaintiff's complaint.

SUMMARY JUDGMENT STANDARD
Courts have repeatedly recognized that summary judgment is a harsh remedy which should only be granted when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Electric Cooperative Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. City of Mt. Pleasant, supra, 838 F.2d at 273. Once the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that can logically be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the non-moving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.

STATEMENT OF FACTS
Plaintiff is a corporation which manufactures and sells urethane bowling balls. The Professional Bowlers Association of America is a nonprofit membership association. The Professional Bowlers Association, Inc. is a wholly owned subsidiary of the Professional Bowlers Association of America which organizes and promotes televised bowling tournaments throughout the United States. The Court will refer to both defendants as the "PBA" or "defendants" when it refers to them collectively.
The Professional Bowlers Association, Inc. sells approximately thirty-four national tournaments to the television networks and title sponsors every year. Each PBA tournament begins with a field of approximately 160 bowlers. After several rounds of play, only the top five bowlers remain. The final rounds of play among the top five bowlers are televised in a program which lasts approximately one and one-half hours. The bowlers compete for purses which range from $125,000 to $400,000. The money for the tournament purses comes from two sources. First, the PBA licenses to television networks the right to televise the final rounds of PBA national tournaments. The television networks pay the PBA a rights fee in exchange for the licenses. Second, the PBA sells to corporate sponsors the right to associate their name with particular tournaments.
The PBA sells its national tournaments to the networks in three packages, or tour segments. From January through April, ABC broadcasts the "Winter Tour". From June through August, ESPN broadcasts the "Summer Tour". From October through December, NBC broadcasts the "Fall Tour". The television networks purchase the rights to televise PBA tournaments because they can sell 30-second *920 commercial spots to advertisers who wish to advertise their products during the broadcast of the final rounds of the tournaments.
Manufacturers of bowling balls, such as plaintiff, encourage professional bowlers to use their balls during the televised portion of the PBA tournaments. To entice professional bowlers to use their balls during televised tournament play, the manufacturers frequently establish an incentive program by which a manufacturer agrees to pay a certain sum to a professional bowler who uses that manufacturer's ball in the televised portion of the tournament.
In 1984 plaintiff introduced its first bowling ball known as the Blue Tank. Plaintiff submitted the Blue Tank ball to the PBA and in 1984 received approval for the use of the Blue Tank in PBA tournament play. The Blue Tank had a picture of a military tank on its side. Several manufacturers have named their balls and have placed a depiction of the name on the side of the ball. Plaintiff offered an incentive program for bowlers who used the Blue Tank during televised tournament play. The Tank was used three times during televised tournament play during the year of its introduction.
In 1985 plaintiff decided to introduce the "Bud Ball." Plaintiff obtained a license from Anheuser-Busch ("A-B"), a leading manufacturer of domestic beer, for the use of the Budweiser bow tie logo. To create the Bud Ball plaintiff placed the Budweiser bow tie logo on a bowling ball colored in Budweiser red. Plaintiff made arrangements with A-B to develop an incentive program for use of the Bud Ball which would substantially increase a bowler's earnings if he won a PBA tournament while using the Bud Ball.
The PBA promulgates rules and regulations ("PBA Rules") which regulate PBA tournaments and other aspects of the sport of professional bowling. The PBA Rules establish product standards for bowling balls and other bowling equipment. The PBA Rules also restrain PBA bowlers concerning their usage of bowling articles bearing commercial advertisements. The PBA Rules which are relevant to the instant action include:
Rule VII, Section A [before any bowler can use any new equipment in PBA competition it must have PBA clearance].
Rule VII, Section E [prohibits logos on bowling balls other than the original under which they were manufactured].
Rule XI, Section I and J [before any bowler can avail himself of an incentive offer, it must have PBA approval].
Rule XVIII, Section D [proscribes speech by PBA bowlers during interviews of the name of a commercial organization or product unless it relates to the tournament's title sponsor].
Rule XX, Section A [logos competitive with a title sponsor are precluded from appearing on a player's shirt].
Manufacturers of bowling balls must apply to the PBA for certification of their balls before a bowling ball can be used in PBA tournament play. On July 16, 1986 Mr. Donald Budde of plaintiff wrote to Mr. Joseph Antenora, commissioner of the PBA, concerning the Bud Ball. Mr. Budde informed the PBA that plaintiff would be introducing the Bud Ball later in the summer for use during the 1986 Fall Tour on NBC. Mr. Antenora mentioned the Bud Ball to Mr. Eddie Elias. Mr. Elias negotiates on behalf of the PBA the sale of the PBA's television rights to the networks and the sale of title sponsorships to the corporations.
Mr. Elias was concerned that the appearance of the Bud Ball in the Fall Tour would cause friction with NBC. Mr. Elias contacted Mr. James Burnette, who was in charge of sales at NBC. Mr. Burnette informed Mr. Elias that NBC would refuse to show the Bud Ball if it were used in one of the tournaments televised by NBC during the Fall Tour. Mr. James Nottingham, an employee in NBC's standards and practices department, warned Mr. Antenora that NBC would consider it a breach of contract if the Bud Ball were used during one of its televised tournaments, and that NBC may not televise the tournaments if the Bud Ball were used. A-B contacted *921 NBC in order to persuade NBC to change its position, but to no avail.
In 1983, NBC and the PBA executed a contract for the years 1984 and 1985 under which NBC provided the production crew for each event on the Fall Tour and paid the PBA a fixed rights fee to televise the tournaments. In 1986, NBC renewed its contract with the PBA on substantially different terms. For 1986 NBC insisted that the PBA assume the responsibility for producing its events. NBC did not pay to the PBA a fixed rights fee. Instead, the PBA had to sell 24 commercial spots (of 30 seconds' length each) per tournament for NBC. The funds from the sale of the commercial spots went directly from the advertiser to NBC. The PBA guaranteed that it would raise a certain sum from such sales. If the PBA was able to arrange for advertising income over this set amount, the PBA would keep the excess amount. However, if the PBA was not able to generate enough spot commercial sales to reach this level, the PBA would suffer a reduction in the rights fees paid to them by NBC to make up the shortfall.
The PBA sells sponsorships for its individual tournaments. Corporate sponsors pay the PBA a fee in order to associate their name with a particular tournament. The PBA was concerned that the Bud Ball would violate their contracts with sponsors such as Brunswick and AMF. Miller Brewing Company ("Miller") changed its sponsor contract in response to the Bud Ball. Miller's sponsor contract with the PBA gave Miller the right to exclude the appearance of advertising for products competitive with Miller during the broadcast of a tournament which Miller sponsored. After the Bud Ball was introduced, Miller changed the terms of the contract with the PBA to prohibit the use of any bowling items containing commercial logos during tournaments it sponsors.
On August 27, 1986 plaintiff made written application to the PBA for a determination that the Bud Ball conformed with PBA product specifications, and for certification of the Bud Ball for use by PBA members. Prior to the application for the Bud Ball, no other ball submitted to the PBA was ever denied clearance. On November 3, 1986 the PBA Executive Board refused to approve plaintiff's application for certification for PBA tournament use. Plaintiff was notified of the PBA Executive Board's action in a letter from Mr. Antenora dated December 8, 1986. The PBA Executive Board subsequently voted to "table clearance" of the Bud Ball. To date the Bud Ball has not been cleared for PBA use. The sole reason for the decision was the appearance of the commercial logo on the ball.
The Bud Ball was cleared for use by the American Bowling Congress on December 5, 1985 and June 20, 1986, and by the Ladies Professional Bowlers Tour ("LPBT") in November, 1986. The Bud Ball was used by bowlers in LPBT tournaments televised on ESPN.
The only other bowling ball manufactured by plaintiff is the Black Tank. The Black Tank is identical in construction and composition to the Bud Ball, but is different in appearance. The Black Tank is black and has a military tank pictured on it. Plaintiff sought and received clearance for use of the Black Tank in PBA tournament play beginning on April 18, 1988.
The PBA permits its members to wear commercial logos on their shirts and pants during televised tournament play. The PBA Rules permit professional bowlers to wear a total of three commercial logos on the shirt and pants. Professional bowlers must secure prior approval from the PBA for each logo they desire to wear.
The PBA has cleared a bowling ball for use in PBA tournament play that bears the name of a bowling alley  Timber Lanes. The bowling ball was approved for use during a regional tournament in the Northwest which was not televised. The Timber Lane ball, however, was not permitted to be used in a national televised tournament.

RELEVANT MARKET
Defendants assert that plaintiff's claims under Section 1 and 2 must fail because defendants do not possess monopoly power in the relevant market. To determine *922 whether competition has been harmed in violation of the antitrust laws, the Court must define the relevant market. The relevant market is determined by reference to both the product market and the geographic market.[1]Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Plaintiff defines the relevant product market as items used by professional bowlers during televised tournament play. The Court suspects that plaintiff's definition of the relevant market is too narrowly drawn. Defendants, however, have failed to present the Court with sufficient evidence to expand the relevant product market to include other means of advertising a bowling ball.
The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendants' product or service. United States v. E.I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). This comparative analysis has been characterized as the "reasonable interchangeability" standard. The DuPont court noted that reasonable interchangeability may be gauged by (1) the product's uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity of demand).[2]
Furthermore, a market can be divided into several submarkets. The market test may be utilized in conjunction with the submarket criteria promulgated in Brown Shoe Co. v. United States, supra. A submarket may be determined by examining such practical indicia as (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. 370 U.S. at 325, 82 S.Ct. at 1523.
In the instant matter the product market to be defined is that for the advertisement of a bowling ball. Defendant has attempted to define the product market as the advertisement of beer. Plaintiff manufactures and sells bowling balls, not beer. Although A-B manufactures and sells beer, A-B is not a party to this suit and does not claim that it was injured by defendants' refusal to sanction the Bud Ball. Furthermore, plaintiff seeks to advertise the Bud Ball in order to sell bowling balls, not beer. The mere fact that the bowling ball contains the logo of a beer manufacturer does not change the nature of the product from bowling balls to beer. Therefore, defendants arguments concerning the numerous avenues by which A-B advertises Budweiser beer are properly disregarded as immaterial.
Defendants assert that the plaintiff has many options for the advertisement of a bowling ball: (1) plaintiff may purchase commercial spots advertising the Bud Ball during televised PBA tournaments or other sporting events, (2) plaintiff may purchase the sponsorship of a PBA tournament, (3) plaintiff may purchase print advertisements in bowling journals and other media, and (4) plaintiff may pay professional bowlers to endorse the Bud Ball. Defendants, however, did not carry their burden in broadening the relevant product market by merely listing the options by which plaintiff may advertise the Bud Ball.
Only reasonably interchangeable products may be included in the same market. A product is reasonably interchangeable for another if consumers of the products considered them to be reasonable substitutes. The consumer of the product in the instant matter is a purchaser of advertising for a bowling ball. Therefore, the question is whether the purchaser of advertising for *923 a bowling ball considers spot commercials, tournament sponsorships, print advertisements, and paid endorsements as reasonable substitutes for a professional bowler using the ball during a televised tournament. Defendants may prove products are reasonably interchangeable by presenting the Court with a measurement of their cross-elasticities of demand. For example, if the price of a spot commercial increases, do purchasers of advertising for sporting goods purchase endorsements from professional athletes instead. The Court has no evidence of cross-elasticity before it. Instead, defendants merely argue that plaintiff's definition of the relevant product market is untenable given its options in advertising. The Court disagrees.
As narrow as plaintiff's product market appears, plaintiff may still have defined a valid submarket. Professional bowlers are role models for the amateur bowlers who observe them during televised tournament play. The use of a bowling article during televised tournament play allows the viewing consumer to see that the product has the endorsement of the professional using the product. An amateur bowler who watches the televised tournament may place great significance on the bowling ball used by the successful professional bowlers of the day. Therefore, this endorsement can have a significant effect on the sale of the product so used.
Furthermore, the PBA is the sole sponsor of televised tournament play for men. Professional bowling does not attract live viewers in significant numbers, and gets no televised coverage except for the tours sponsored by defendants. If a professional bowler cannot use the Bud Ball during televised tournament play, his paid endorsement in a spot commercial or print advertisement would be discounted by the consumer who watches the televised tournament play. The viewer would question the quality of the ball when a professional bowler endorses the ball during a commercial advertisement but uses another ball during televised tournament play.
In sum, although the Court suspects that plaintiffs' submarket may be too narrowly defined, defendant has failed to carry its burden to broaden the relevant product market by proving the substitutability of other means of advertising. For the purposes of the motion for summary judgment, the Court will assume that the relevant product market is the items used by professional bowlers during televised tournament play. For the foregoing reasons, defendant's motion for summary judgment on the ground that it does not possess a monopoly in the relevant market is denied.

SECTION 2 CLAIMS
In Counts III, IV, V, VI, and VII plaintiff alleges that defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2. The Court considers Count IV (essential facility) and Count VI (tying arrangement) separately, infra. The Court now addresses the merits of Counts III, V, and VII. The factual allegations underlying all three counts are the same. Professional bowlers must join the PBA to enter PBA tournaments. The PBA Rules, to which PBA members must adhere, proscribe the use of bowling balls which have not been sanctioned by the PBA. Because the Bud Ball was not sanctioned by the PBA, no professional bowler could use the Bud Ball during televised tournament play. In Count III plaintiff alleges that defendants monopolized or conspired to monopolize the market of commercial advertising on bowling articles used in televised tournament play. Plaintiff asserts that defendants have abused this monopoly power by unreasonably and arbitrarily excluding the Bud Ball from being used in tournament play. In Count V, plaintiff alleges that defendants have used their monopoly power over the administration of the sport of bowling to monopolize the adjacent market of advertising services applied to commercial bowling articles used in televised tournaments. In Count VII, plaintiff alleges that defendants have attempted to monopolize or conspired to attempt to monopolize the relevant market.
To establish monopolization in violation of Section 2 it must be shown that defendants (1) possessed monopoly power *924 in the relevant market; and (2) used its monopoly power to foreclose competition, gain a competitive advantage, or destroy a competitor. Trace X Chemical v. Canadian Industries, 738 F.2d 261, 265 (8th Cir. 1984), cert. denied, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).

A. Monopoly Power

For purposes of this motion for summary judgment the Court has accepted plaintiff's definition of the relevant market as being articles that a professional bowler uses during televised tournament play. Monopoly power is defined as the power to control prices and exclude competition with respect to a particular product and within a particular geographic market. United States v. E.I. du Pont de Nemours & Co., supra, 351 U.S. at 391, 76 S.Ct. at 1004. Since defendants exercise absolute control over the articles professional bowlers may use during televised tournament play, and may prohibit the use of any article, defendants do possess monopoly power in the relevant market.

B. Anti-Competitive Behavior

To prove a violation of Section 2, whether based upon a claim of attempted or actual monopolization, plaintiff must show defendants engaged in anticompetitive behavior, that is, defendants used their monopoly power to foreclose competition, gain a competitive advantage, or destroy a competitor. Trace X Chemical v. Canadian Industries, supra, 738 F.2d at 265-66. A mere showing of monopoly power unaccompanied by evidence of anticompetitive behavior is insufficient to support a claim for illegal monopolization. Id. (citing Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76 (2d cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982)). If defendant's activities were not anticompetitive, defendant is absolved of liability for claims of monopolization and attempted monopolization. Trace X Chemical, supra, 738 F.2d at 266.
Anticompetitive conduct is conduct without legitimate business purpose. Id. (citing Becker v. Egypt News Co., 713 F.2d 363, 366 (8th Cir.1983)). Such conduct makes sense only because it eliminates competition. Id. Acts which are ordinary business practices typical of those used in a competitive market do not constitute anticompetitive conduct violative of Section 2. Trace X Chemical, supra, 738 F.2d at 266 (citing Telex Corp. v. IBM, 510 F.2d 894, 925-26 (10th Cir.1975), cert. denied, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975)). To be labeled anticompetitive, the conduct involved must be such that its "anticipated benefits were dependent on its tendency to discipline or eliminate competition and thereby enhance the firm's longterm ability to reap the benefits of monopoly power." Trace X Chemical, supra, 738 F.2d at 267 (quoting William Inglis v. ITT Continental Baking Co., 668 F.2d 1014, 1030 (9th Cir.1982), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)).
There is little dispute between the parties as to why defendants refused to sanction the Bud Ball for PBA tournament play. The Court has closely examined the reasons proffered by defendants for their refusal to sanction the Bud Ball and concludes that defendants' actions were neither unreasonable nor anticompetitive but a valid exercise of business judgment to protect their enterprise.
First, defendants' refusal to sanction the Bud Ball was in response to NBC's negative reaction to the idea of a bowling ball bearing a commercial advertisement. NBC frowned upon the Bud Ball as a means of free advertising for A-B, and informed the defendants that it did not want the Bud Ball to appear during the 1986 Fall Tour. If defendants sanctioned the Bud Ball despite NBC's resistance, NBC may have considered defendants' action a breach of the contract and refused to televise the 1986 Fall Tour.
Defendants' ability to effectively serve the interests of professional bowlers is dependent upon defendants' obtaining television coverage of the tours. The purpose of PBA, Inc. is to organize and promote bowling tournaments in which its members compete for prize money. There are two *925 sources of prize money: 1) corporations that sponsor tournaments, and 2) networks that pay defendants a licensing fee to televise the tournaments.[3] If the tournaments in the 1986 Fall Tour did not receive television coverage, the sources of prize money would disappear. NBC would not pay defendants a rights fee if it did not televise the tournaments. Also, the value of a corporate sponsorship for a particular tournament would decrease if the tournament was not nationally televised. Although defendants may have capitulated under pressure from NBC, a good working relationship with NBC and the other networks is crucial to defendants' ability to serve professional bowlers. The networks have control over defendants' lifeline through their televising of defendants' tours. Defendants, which had legitimate concerns over their vitality, did not behave anticompetitively because they succumbed under pressure from NBC concerning approval of the Bud Ball.
Second, defendants were concerned that the appearance of the Bud Ball on a tour would decrease the number of corporations willing to sponsor tournaments. Miller, one of defendants' regular tournament sponsors, did not want the products of a competitor to be advertised during a tournament it sponsored. Miller changed the terms of its sponsorship contract to prevent the use of any commercial logos on the articles worn or used by professional bowlers during the tournaments Miller sponsored. No corporate sponsor seeks to have the advertising value of its sponsorship diluted by the commercial logos of other companies.
Third, the presence of the Bud Ball in a tournament would decrease the value of spot commercial time. The price of a spot commercial decreases as the amount of intra-program advertising increases. Therefore, if beer is being advertised on the side of the bowling ball during the PBA tournament, the price of a spot commercial shown during a commercial break decreases.
In the 1986 Fall Tour defendants had an immediate concern over the price of spot commercial time. Defendants had to raise a certain amount of revenue from selling spot commercials or suffer a reduction in the rights fee. A decrease in the value of spot commercial time might translate into a direct monetary loss for defendants. Defendants are concerned about the price of spot commercial time even when defendants are not responsible for selling spot commercials. The networks pay defendants a rights fee to televise the tournaments because they can sell spot commercial time to advertisers who want to promote their products during the tournament. If the value of spot commercial time decreases for any reason (i.e. decrease in the number of viewers, change in the demographics of viewers, increase in advertising during the tournament), the networks will reduce the rights fee paid to defendants to televise the tournaments. Furthermore, if the price of spot commercial time decreases, the PBA tours become less attractive to the networks vis-a-vis other programs they can televise instead. Therefore, it is in the interest of defendants to maximize the value of spot commercial time so defendants are not lured to televise other programs.
Plaintiff asserts that defendants' refusal to sanction the Bud Ball was arbitrary. First, plaintiff points to other sports such as auto racing, boxing, tennis, and golf where the professional athletes are freely permitted to endorse products during the televised broadcast of the sporting event. For example, the cars in televised auto races are covered with commercial logos. Defendants assert that their decision is to keep the sport of professional bowling "clean", that is, free from the numerous intra-program commercial advertisements *926 that bombard the television viewer of an auto race. The Court agrees that defendants have discretion over whether to permit commercial advertising during the sports event on the equipment that athletes use, or keep the sport "clean" and maximize the price of advertising for spot commercials. The Court will not grant potential advertisers the power to determine the amount and type of advertising that the sport must allow.
Second, the PBA Rules permit professional bowlers during televised tournament play to wear a maximum of three commercial logos on their shirt and pants. For example, the PBA Rules may permit a professional bowler to wear an A-B logo on the sleeve of his shirt during televised tournament play. Defendants receive no compensation from either the professional bowler or the advertiser when the logo is worn. Defendants have drawn a line between commercial logos on clothing and commercial logos on the bowling ball. First, the networks have not voiced any opposition to logos worn on the professional bowlers' clothing. Second, defendants perceive a distinction between wearing a logo on a shirt, and placing a logo on a bowling ball. Because defendants have discretion over the type of advertising they will allow during their tournaments, defendants may be arbitrary in permitting logos on one article but not on another without violating the antitrust laws. Plaintiff also argues that defendants sanctioned a bowling ball with the name of a bowling alley  Timber Lanes  emblazoned on its side. Defendants' approval of the Timber Lanes Ball is distinguishable. The Timber Lanes ball was used during a regional tournament which did not receive any television coverage. Defendants refused to sanction the Timber Lanes ball for use during a televised tournament.
Plaintiff asserts that defendants made no effort to negotiate with plaintiff concerning the approval of the Bud Ball. Defendants never offered to sanction the Bud Ball on the condition that the television camera shoot around it. Also, defendants could have shown the Bud Ball but concealed the A-B logo. This argument contravenes the raison d'etre of the lawsuit. Plaintiff argues that the success of the Bud Ball was dependent on defendants' approval of the ball for use in televised PBA tournaments. Plaintiff sought approval for the Bud Ball so television viewers of the tournaments would see the great bowlers of the day using the Bud Ball and purchase it for themselves. If the network shot around the Bud Ball or made it unrecognizable to the television viewer, plaintiff would not receive the valuable endorsement they contend is necessary for the successful marketing of the ball.[4]
Plaintiffs depict defendants' refusal to sanction the Bud Ball as anticompetitive. The Court, however, views defendants' action as a sound exercise of business judgment calculated to preserve their ability to serve the interests of professional bowlers. For the foregoing reasons, the Court enters summary judgment in favor of defendants and against plaintiff on the merits of Count III, Count V, and Count VII of plaintiff's complaint.

ESSENTIAL FACILITIES
In Count IV plaintiff alleges that defendants have denied plaintiff an essential facility in violation of 15 U.S.C. § 2. Plaintiff defines the facility as the items which professional bowlers may use during televised tournament play. Defendants, through their rules which regulate the equipment a bowler may use during televised tournament play, has monopoly power over this facility. Plaintiff alleges that access to this facility is essential for the effective promotion of its commercial bowling articles.
Under the essential facilities doctrine, those in possession of facilities which cannot practically be duplicated must *927 share the facilities with their competitors on fair terms. City of Malden, Mo. v. Union Electric Company, 887 F.2d 157, 160 (8th Cir.1989). The policy behind prohibiting denial of an essential facility to a competitor, at least in part, is to prevent a monopolist in a given market from using its power to inhibit competition in another market. Twin Laboratories v. Weider Health & Fitness, 900 F.2d 566, 568 (2nd Cir.1990). The essential facilities doctrine requires (1) control of an essential facility by a monopolist, (2) the inability to practically or economically duplicate the facility, and (3) the unreasonable denial of the use of the facility to a competitor when such use is economically and technically feasible. City of Malden, Mo. v. Union Electric Company, supra, 887 F.2d at 160 (Emphasis added).
For this motion the Court will assume the existence of the first two factors. The third factor, however, is not satisfied because plaintiff and defendant are not competitors in any market. Plaintiff manufactures and sells bowling balls. For the purposes of this action, plaintiff also competes with other businesses which seek to advertise their products during the PBA tour. The PBA organizes and promotes televised bowling tournaments throughout the United States. Defendants sell to networks the right to televise the tournaments. Defendants compete with other sporting events and non-sport programs which seek to be televised by the networks. Also, defendants sell to corporations the right to associate their name with a particular tournament. Defendants compete with other events that seek corporate sponsorship. It is clear that plaintiff and defendant are not competitors.
The Court has surveyed the relevant cases for applications of the essential facilities doctrine to the field of advertising. The Court has found several cases that are distinguishable from the instant matter. In Soap Opera Now, Inc. v. Network Publishing Corp., 737 F.Supp. 1338 (S.D.N.Y. 1990), plaintiff and defendant both published a periodical which focused on daytime soap opera news, gossip, and coming attractions. Plaintiff published its periodical in the form of a short newsletter; defendant's periodical was a 150 page color magazine. When defendant refused to permit plaintiff to advertise plaintiff's newsletter in defendant's magazine, plaintiff sued defendant for a violation of the essential facilities doctrine. The court dismissed the essential facilities claim because plaintiff and defendant were not competitors. The court stated:
Even assuming that the [defendant] possesses market power in its product market, plaintiff's monopolization and attempted monopolization claims premised upon an essential facilities theory must fail. [P]laintiff's attempt claim is deficient because [plaintiff] and [defendant] do not compete in any market. For the same reason, any other possible claim under an essential facilities theory must fail. In order to make out a claim under the essential facilities doctrine, a plaintiff must demonstrate "a competitor's inability practically or reasonably to duplicate the essential facility," and "the denial of the use of the facility to a competitor." [Citations omitted]. Because plaintiff has not raised a factual issue as to whether the [defendant] denied its services "to a competitor," any claim based upon the denial of an essential facility must be dismissed.
737 F.Supp. at 1348-49.
In Twin Laboratories v. Weider Health & Fitness, supra, the plaintiff and defendant both produced nutritional supplements for body builders. Both parties also published bodybuilding magazines. Defendant published two magazines which were universally acknowledged to be the leading magazines in the bodybuilding field; plaintiff's magazine had a much smaller circulation. When defendant terminated plaintiff's ability to purchase advertising spots for nutritional supplements in defendant's magazines, plaintiff brought an action against defendant claiming a violation of the essential facilities doctrine. In Twin Laboratories the essential facilities doctrine properly applied because the plaintiff and defendant were competitors in the sale of nutritional supplements. The advertising *928 space sought in by plaintiff in defendant's magazines was to be used to advertise a product in direct competition with a product manufactured by defendant.[5] In the instant matter, plaintiff and defendant are not competitors.
Plaintiff asserts that plaintiff and defendants are potential competitors because defendants may, at some future time, require or entice bowlers to wear clothing and use equipment bearing defendants' logo during televised PBA tournaments. Therefore, plaintiff and defendant would compete to get professional bowlers to display products with their respective logos. Plaintiff's argument is without merit. Although possible or prospective competition between the parties may satisfy the competition element of an essential facilities claim, there must be a link between the possible or prospective competition and the reason defendants denied plaintiff access to the essential facility.
Defendants did not refuse to sanction the Bud Ball because they would like to place their logo on bowling balls instead. Defendant refused to sanction the Bud Ball because it contained the logo of A-B which is not the manufacturer of the ball. Bowling balls adorned with the manufacturer's logo have been sanctioned by defendants. Also, bowling balls adorned with a depiction of the name of the ball, such as plaintiff's Blue Tank and Black Tank balls, have been sanctioned by defendants. Plaintiff's Black Tank ball was sanctioned after the plaintiff's failed attempt to introduce the Bud Ball. Although the PBA has discussed the possibility of having professional bowlers wear its logo or use equipment with its logo, these discussions are remote from defendants' refusal to sanction the Bud Ball. The Court will not permit plaintiff to circumvent the requirement of competition between the parties by setting forth a purely speculative source of competition between plaintiff and defendants which is unrelated to defendants' denial of the alleged essential facility.
For the foregoing reasons, the Court enters summary judgment in favor of defendant and against plaintiff on Count IV of plaintiff's complaint.

TYING CLAIM
In Count VI plaintiff alleges that defendants violated 15 U.S.C. §§ 1 and 2 by the employment of an illegal tying arrangement. Plaintiff seeks monetary relief under 15 U.S.C. § 15 and injunctive relief under 15 U.S.C. § 26. In order to enter a tournament sponsored by defendant, a professional bowler must purchase a membership to the PBA. As a member of the PBA, the professional bowler must adhere to the PBA Rules. The PBA Rules restrict the items a professional bowler may use during a tournament by requiring prior approval by the PBA. A professional bowler who joins the PBA is subject to disciplinary sanctions if he disobeys the PBA Rules.
"A tying arrangement is defined as the sale of one item (the tying product) on the condition that the buyer purchase a second product (the tied product) from the same source." Rosebrough Monument Co. v. Memorial Park Cemetery Association, 666 F.2d 1130, 1140 (8th Cir.1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). In Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1985), the Supreme Court explained:
[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.
466 U.S. at 12, 104 S.Ct. at 1558.
Plaintiff defines the tying product as the right to enter PBA sponsored tournaments, and the tied product as the membership in the PBA. In order to participate in the *929 PBA sponsored tournament, the professional bowler must purchase a membership in the PBA.[6] Professional bowlers might forego membership in the PBA, and all the restrictions on their conduct that PBA membership entails, if entry into PBA sponsored tournaments was not "tied" to PBA membership.
Defendants argue that plaintiff lacks standing to bring a claim for a tying arrangement. The question of standing to sue under the Clayton and Sherman Acts is one of law. In Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983), the Supreme Court explained that antitrust standing requirements go beyond injury in fact. The court must also determine whether the plaintiff, even if injured, is the proper party to bring the action.

A. Section 4

Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes private damage suits for violations of federal antitrust laws by persons injured in their "business or property by reason of anything forbidden in the antitrust laws...." The language of this section, if interpreted expansively, provides any party which can show a causal link between the injury and violation, no matter how remote, with standing to sue. Numerous courts, however, have narrowed the potential scope of Section 4 to prevent unfair and oppressive results. Midwest Communications v. Minnesota Twins, 779 F.2d 444, 450 (8th Cir.1985), cert. denied, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).
The plaintiff must demonstrate that the antitrust injury is of the type the antitrust laws were designed to prevent and that the injury flows from that which makes the defendant's acts unlawful. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "[A] mere causal connection between an antitrust violation and harm to plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect." McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir.), cert. denied, 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984). To have standing to sue under the antitrust laws, the plaintiff must be the target of the anticompetitive activity, "not one who has merely suffered indirect, secondary, or remote injury...." Midwest Communications v. Minnesota Twins, supra, 779 F.2d at 451 (8th Cir.1985) (quoting Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710 (11th Cir.1984)).
The Court must first define the antitrust injury that the antitrust laws concerning tie-ins were designed to prevent. The anti-competitive effects of the tying agreement are two fold. First, the tying agreement may force the party subject to the tie to give up substitutes for the tied product, or may force the party subject to the tie to purchase a product for which he has no use. Second, the tying agreement may destroy the free access into the market of suppliers of the tied product. United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11, 18 (1962). Therefore, the court's focus is upon competition in the tied market. Because restraints on competition in the tied market affect consumers and competitors in the tied market, consumers and competitors in the tied market are the parties that have standing to sue. Bell v. Dow Chemical Co., 847 F.2d 1179, 1183 (5th Cir.1988) (Citations omitted).
In the instant matter the consumers of the tied product are the professional bowlers who must purchase a PBA membership in order to enter PBA tournaments. Although plaintiff is a member of the PBA, plaintiff's membership was apparently voluntary and certainly not the result of coercion in connection with the tying arrangement alleged in this action. Therefore, plaintiff is not a purchaser or potential purchaser of the tied product. Plaintiff is also not a competitor in the market for the tied product. Plaintiff neither sells memberships *930 to professional bowlers nor sponsors tournaments.

B. Section 16

Section 16 of the Clayton Act, 15 U.S.C. § 26, also authorizes private suits for injunctive relief "against threatened loss or damage by a violation of the antitrust laws...." Although the standing rules for suits under Section 4 and Section 16 of the Clayton Act are somewhat different, standing under Section 16 also requires that the plaintiff show a threatened antitrust injury to receive injunctive relief. As was explained supra, the injury to which plaintiff is threatened is not one which the antitrust law against tying arrangements was designed to protect.
In sum, the laws against tie-in arrangements were designed to protect competition in the tied market. Although plaintiff's injury may be causally related to the alleged illegal tie-in, plaintiff's injury is only tangential to that which the antitrust laws were designed to protect. For the foregoing reasons, the Court enters summary judgment in favor of defendants and against plaintiff on Count VI of plaintiff's complaint.

SECTION 1 CLAIMS
In Counts I and II of its complaint plaintiff alleges that defendant violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act provides in part:
Every contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. ...
15 U.S.C. § 1. There are two essential elements of any Section 1 offense: (1) a contract, combination, or conspiracy, resulting in (2) an unreasonable restraint of trade. Pumps & Power Co. v. Southern States Industries, 787 F.2d 1252, 1256 (8th Cir.1986); Overseas Motors, Inc. v. Import Motors Limited, Inc., 375 F.Supp. 499, 531 (E.D.Mich.1974), aff'd 519 F.2d 119 (6th Cir.), cert. denied 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

A. Proof of Combination or Conspiracy

To find a violation of Section 1, the Court must first find the existence of a contract, combination, or conspiracy. International Travel Arrangers, Inc. v. Western Airlines, 623 F.2d 1255, 1265 (8th Cir.), cert. denied 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). A conspiracy imports a plurality of persons acting in concert to attain a common goal or purpose. White v. Hearst Corp., 669 F.2d 14, 18 (1st Cir.1982). Neither independent nor unilateral action is proscribed. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, reh'g denied, 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984); Pumps & Power Co. v. Southern States Industries, supra, 787 F.2d at 1256 (8th Cir.1986). Plaintiff alleges that the Professional Bowlers Association, some of its Executive Board members, Professional Bowlers Association, Inc., Miller as a advertising sponsor, NBC, ABC, and professional bowlers who are members of the Professional Bowlers Association conspired to exclude the Bud Ball from tournament appearances.
First, Miller was not a participant in any concerted action. Miller's sponsor contract with the PBA gave it the right to exclude the appearance of advertising for products competitive with Miller during the broadcast of a tournament which Miller sponsored. After the Bud Ball was introduced, Miller changed the terms of the contract with the PBA to prohibit the use of any bowling items containing commercial logos. There is no evidence of concerted activity on the part of Miller. Prior to the inception of the Bud Ball Miller would not have allowed the advertising of a competitor, such as A-B, during a tournament that Miller sponsored. After the inception of the Bud Ball, Miller altered its contract to exclude advertising of all non-Miller products. The action of Miller to alter its sponsorship contract was taken independently and unilaterally.
With the exception of Miller, the Court will assume, for purposes of defendant's motion, that plaintiff has alleged sufficient *931 facts to prove a conspiracy involving defendants.

B. Unreasonable Restraint of Trade

The second element of a Section 1 violation, unreasonable restraint of trade, may be established by proof that the conspiracy was of a type that the law finds to be inherently unreasonable (a per se violation), or it may rest on a showing of anticompetitive motive or effect in the particular case (a rule of reason violation). Overseas Motors, Inc. v. Import Motors Limited, Inc., supra, 375 F.Supp. at 531.

1. Per Se Analysis
"There are certain business combinations and practices which are so pernicious and devoid of redeeming attributes that they are considered to be unreasonable restraints on interstate or foreign commerce per se." Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, 578 F.2d 1256, 1259 (8th Cir.1978). If a party is injured as a result of a per se violation of § 1 of the Sherman Act, he need not allege or prove any particular effect or impact of the violation on interstate or foreign commerce; the existence of such an effect or impact is conclusively presumed. Id.
As the Supreme Court stated in Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19, 20, 99 S.Ct. 1551, 1562-63, 60 L.Ed.2d 1 (1979), a practice could only be considered a per se violation if its effect and purpose was "to threaten the proper operation of our predominately free-market economy," that is, if the practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output." Thus, the per se label must be applied only after the courts have had considerable experience with the type of conduct challenged and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects. Havoco v. Am. Ltd. v. Shell Oil Co., 626 F.2d 549, 553 (7th Cir.1980).
Certain categories of per se violations are well defined and include price fixing, certain concerted refusals to deal, horizontal market division, and certain types of tying agreements. Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, supra, 578 F.2d at 1259; Sewell Plastics, Inc. v. Coca Cola Co., 720 F.Supp. 1186, 1190 (W.D.N.C. 1988).

I. Group Boycott
In Count I plaintiff alleges that defendant participated in a group boycott in violation of Section 1. Plaintiff's claim concerning a group boycott does not set forth a per se violation of the antitrust laws. Group boycotts are considered to be per se illegal only when they are engaged in by competitors of the plaintiff. In F.T.C. v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), the Court stated:
As we observed last Term in Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284 [105 S.Ct. 2613, 86 L.Ed.2d 202] (1985), the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor....
106 S.Ct. at 2018.
In Lomar Wholesale Grocery v. Dieter's Gourmet Foods, 824 F.2d 582 (8th Cir. 1987), cert. denied, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988), the Court stated:
We believe that absent any collusion at some horizontal level, "[]the rule of reason provides a more discriminating way of differentiating" the procompetitive refusal to deal from the anticompetitive one. Because [plaintiff's] complaint alleged no combination between horizontal competitors, the District Court did not err ... in awarding summary judgment to defendants on [plaintiff's] claim that defendants violated the per se rule by engaging in a group boycott.
824 F.2d at 595 (quoting Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 132 n. 6 (2d Cir.1978)).
*932 In the instant matter, neither defendants nor the networks are competitors of plaintiff. Plaintiff seeks to place advertisements on bowling balls used by professional bowlers during televised tournaments. Plaintiff asserts that the placement of an advertisement on a bowling ball would make it a competitor of defendants and the networks because the advertisement on the bowling ball would compete with defendants and the networks' sale of spot commercial time during the broadcast of the tournament. Thus, plaintiff and defendants are horizontal competitors and the alleged group boycott should be determined on a per se theory of liability.
The Court rejects plaintiff's characterization of this relationship as competition. The networks sell spot commercial time to be aired during the broadcast of PBA tournaments; for the 1986 Fall Tour defendants sold commercial time to be aired during the broadcast of PBA tournaments. Plaintiff, which seeks to advertise during the broadcast, has devised a gimmick which will provide both plaintiff and a separate commercial enterprise with a means of advertising during the broadcast of the tournament for which neither will have to pay the networks. This is not a source of competition between the parties; plaintiff does not seek to enter the business of selling advertising.[7] Instead, plaintiff, which would normally be a purchaser of advertising from the networks, seeks to obtain for free a service for which the networks earn their revenue by selling.

II. Price Fixing
In Count II plaintiff alleges that defendant entered an agreement affecting prices in per se violation of Section 1 of the Sherman Act. Plaintiff alleges that by excluding advertising on bowling balls, defendants and the networks can maintain an artificially high level of advertising prices for spot commercials. If commercial advertising were permitted on the side of a bowling ball, the networks would earn less money from the sale of spot commercials, and defendants would earn less money from the sale of the rights to televise the tournaments.
The Supreme Court has defined illegal price fixing to include any "combination formed for the purpose of and with the effect of raising, depressing, fixing, or stabilizing the price of a commodity" or service in interstate or foreign commerce. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 844, 84 L.Ed. 1129, reh'g. denied, 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421 (1940); Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Price fixing is per se illegal if it is done horizontally or vertically. Agreements between competitors that tamper with the selling or purchase price of commodities or services constitute horizontal price fixing. Agreements between persons in the chain of distribution that fix the resale price of a commodity or service constitute vertical price fixing.
In the instant matter the alleged agreement cannot be identified as classic horizontal or vertical price fixing. The Court cannot characterize the price restraint as horizontal because the alleged coconspirators are not competitors of each other or of the plaintiff. The Court cannot characterize the price restraint as classically vertical because defendants do not sell to the networks a product or service for which a resale price is fixed. Defendants sell to the networks the right to broadcast the final rounds of the tournaments. The networks, in turn, sell to advertisers 30 second time spots to be aired during the broadcast of the tournament. Although defendants and the networks each have an interest in maximizing the price of a spot commercial during a tournament broadcast, the product of advertising time is not being transferred from defendants to the networks with an agreement as to what to charge for it. Rather, by refusing to sanction the Bud Ball, defendants have maintained their product in a manner that will enable the network to command a higher price for the advertising than if the Bud Ball appeared in the tournaments. Furthermore, the alleged *933 agreement does not fix the prices of advertising. Instead, the alleged agreement has a positive effect on the prices of spot commercials.
If the business practice challenged has not been subject to any previous judicial experience, and if it does not appear that the practice would always or almost always tend to restrict competition, then the rule of reason should be applied rather than the per se rule. Havoco v. Am. Ltd. v. Shell Oil Co., supra, 626 F.2d at 553. The Court has not encountered a restraint of this nature. Due to the unique relationship between defendants and the networks, and the unique characteristics of the sport of professional bowling, the Court is unable to characterize the restraint as one that is inherently pernicious.
Therefore, the Court concludes that the alleged price restraint is not a per se violation of Section 1 and will instead proceed to a rule of reason analysis.

2. Rule of Reason Analysis
In order to prevail in a cause of action alleging a conspiracy to restrain trade under the rule of reason, plaintiff must establish: (1) an agreement among two or more persons or distinct business entities, (2) which is intended to harm or unreasonably restrain competition, and (3) which actually causes injury to competition. Rosebrough Monument Co. v. Memorial Park Cemetery, supra, 666 F.2d at 1138 (citations omitted). The primary considerations in determining whether a restraint of trade is unreasonable are whether the intent of the restraint is anticompetitive and whether the restraint itself has significant anticompetitive effects. Id. As was explained supra, the intention of defendants was not to harm or unreasonably restrain competition. Instead, defendants refusal to sanction the Bud Ball was a sound exercise of business judgment designed to secure its continued efficacy in serving the interests of professional bowlers.
The restraint does have an anticompetitive effect in that it forecloses the Bud Ball from entry into the submarket defined, supra. The Court, however, has weighed the anticompetitive effects of the foreclosure against the rights of defendants to administer the sport of professional bowling and the networks to earn revenue from the sale of advertising spots, and concludes that any anticompetitive effects are not significant. The Court has considered the ramifications of plaintiff's position to the television broadcasts of sporting or other events. The heart of this suit is not a conflict between plaintiff, a manufacturer of sporting goods, and defendant, an organizer and promoter of sporting events. Instead, the conflict is between plaintiff and the networks that televise sporting events. Plaintiff's position is that the athlete in a televised sporting event should be able to endorse the product of a sporting goods manufacturer by his use of the product. The sporting goods manufacturer receives a valuable endorsement from the athlete; the athlete is handsomely paid by the manufacturer in the form of an incentive payment. Therefore, both the sporting goods manufacturer and the athlete benefit by this arrangement. The networks, which are in the business of selling advertising, suffer in two ways. First, the networks are compelled to permit advertising during their telecast for which they are not compensated. Second, the intra-program advertising decreases the price of spot-commercial programming. The antitrust laws do not require, and this Court will not compel, the networks to give away the product or service that they are in the business of selling.
For the foregoing reasons, defendants' motion for summary judgment concerning Count I and Count II of plaintiff's complaint is granted.

TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
In Count VIII plaintiff alleges that defendants are liable for the state law tort of tortious interference with business relations. In Counts I-VII plaintiff alleged violations of the federal antitrust laws. The Court exercised jurisdiction over Counts I-VII under 28 U.S.C. § 1337, which provides the court with "original jurisdiction *934 of any civil action ... arising under any act of Congress regulating commerce or protecting trade and commerce against restraint and monopolies...." The Court exercised pendent jurisdiction over plaintiff's state law claim.[8]
The Court has entered summary judgment in favor of defendant and against plaintiff on the merits of Counts I-VII of plaintiff's complaint. The Court exercises its discretion to dismiss Count VIII for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Rosado v. Wyman, 397 U.S. 397, 402-405, 90 S.Ct. 1207, 1212-13, 25 L.Ed.2d 442 (1970); Koke v. Stifel, Nicolaus, & Co., 620 F.2d 1340, 1346-1347 (8th Cir.1980).

ORDER
In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that defendants' motion for summary judgment on Counts I-VII is GRANTED. Judgment is entered in favor of defendants and against plaintiff on the merits of Count I, Count II, Count III, Count IV, Count V, Count VI, and Count VII of plaintiff's complaint.
IT IS FURTHER ORDERED that Count VIII of plaintiff's complaint is DISMISSED for lack of subject matter jurisdiction.
NOTES
[1] There is no dispute over the definition of the relevant geographic market. Since defendants organize and promote tournaments throughout the United States, and the tournaments are televised nationwide, the Court assumes that the relevant geographic market is the United States.
[2] Cross-elasticity of demand refers to the change in the demand by consumers for one product as the result of a change in the price of another product. 2 P. Areeda & D. Turner, Antitrust Law 349 (1978).
[3] For the 1986 Fall Tour there was a third possible source of revenue. As was explained supra, for the 1986 Fall Tour NBC did not pay a fixed rights fee. Instead, the PBA had to sell 24 commercial spots (of 30 seconds' length each) per tournament for NBC. The PBA guaranteed that it would raise a certain sum from such sales. If the PBA was able to arrange for advertising income over this set amount, the PBA would keep the excess amount. However, if the PBA was not able to generate enough spot commercial sales to reach this level, the PBA would suffer a reduction in the rights fees paid to them by NBC to make up the shortfall.
[4] Also, plaintiff alleges that defendant never offered to sanction the Bud Ball for a price. This argument is directly related to plaintiff's essential facilities claim, which is discussed, infra. Unless defendants' control an essential facility, defendants have no obligation to deal with plaintiff on any terms.
[5] The Court held that the essential facilities doctrine was not violated because plaintiff failed to show that it had suffered any economic loss due to defendant's actions.
[6] Professional bowlers must also pay a fee to enter a PBA tournament.
[7] In fact, plaintiff paid to A-B a licensing fee for the use of its logo on the Bud Ball.
[8] Plaintiff did not allege diversity of the parties as an independent source of federal jurisdiction.