Marvin RIPPLEMEYER; Howard Bishop; Joe Bishop; Dennis Paulsell; George Piazza; C.B. Berg; Tony Mingo; Joe Bacon; and Jimmy Stacy, Plaintiffs,

v.

NATIONAL GRAPE COOPERATIVE ASSOCIATION, INC.; J. Roy Orton; Patrick O'Donnell; Welch Foods, Inc.; Everett N. Baldwin, Defendants.

Civ. No. 92–5034.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Dec. 3, 1992.

Richard P. Arens, Arens Law Firm, Fayetteville, AR, for plaintiffs.

James M. Simpson, Tonia Jones, Friday, Eldredge & Clark, Little Rock, AR, for defendants.

## MEMORANDUM OPINION

### H. FRANKLIN WATERS, Chief Judge.

Currently pending before the court is a motion to dismiss filed on behalf of the individual defendants, J. Roy Orton, Everett N. Baldwin, and Patrick O'Donnell. Also pending before the court is the defendants' motion for summary judgment that was filed on November 9, 1992. The defendants have moved for summary judgment on each of the claims asserted by the plaintiffs. The plaintiffs have responded to both motions.

This matter was set for trial on November 30, 1992. The plaintiffs response to the summary judgment motion was not due to the court until November 24, 1992. In view of this, and for the reasons stated in a conference call with counsel for the parties the court continued this case and reset it for trial at a later date.

*Background.*

This action was filed on February 28, 1992, by Marvin Ripplemeyer, Howard Bishop, Joe Bishop, Dennis Paulsell, George Piazza, C.B. Berg, Tony Mingo, and Joe Bacon. By amended complaint filed on July 28, 1992, Jim Stacy was added as a plaintiff. Named as defendants are the National Grape Cooperative Association, Inc. (hereinafter National), J. Roy Orton, individually and as an agent and employee of National, Patrick O'Donnell, individually and as an agent and employee of National, Welch Foods, Inc. (hereinafter Welch), and Everett N. Baldwin, individually and as an agent and employee of Welch. J. Roy Orton was elected to the board of directors for National in 1970 and became president of the board in 1981. In 1981, Mr. Orton became the chairman of the board of directors of Welch. Everett N. Baldwin has been employed since 1982 as chief executive officer and president of Welch. Patrick O'Donnell has been employed by National since 1983 and has held the position of general manager since 1984.

The plaintiffs are grape growers in what was designated as area 7 of the eastern pool of National. This lawsuit arises out of the termination of the plaintiffs' memberships in National.

National is an agricultural marketing cooperative. Each plaintiff entered into a membership and marketing agreement with National in order to gain access to a nationwide market for the sale of Concord grapes raised in his vineyard. The marketing agreements provide that the agreements and "all facets of the cooperative relationship between the parties shall be governed and interpreted under the laws of the State of New York applicable to agreements to be performed therein." Pursuant to the agreement, grapes grown by National's members are purchased by National's wholly owned subsidiary, Welch. Welch is a cooperative association whose only member is National. National and Welch are non-stock cooperative corporations. Capitalization is maintained in part through the issuance of allocation certificates and permanent equity capital credits. The termination rights between the members and National are set forth in National's by-laws and the marketing agreements.

Until 1978 Welch operated a plant in Springdale, Arkansas which processed grapes grown by National's members in northwest Arkansas and southern Missouri into finished goods such as Welch's Grape Jelly. In 1978 Welch closed the finished goods production at the Springdale plant. Defendants state the closure of the finished goods production in Springdale was the result of a decline in the volume of grapes produced in northwest Arkansas and southern Missouri and a resulting under-utilization of the plant facility. Welch then installed a "concentrator" at the Springdale plant which processed the grapes into a filler product which could be transported to other Welch facilities for final processing. In 1978, area 7 had 136 members who produced 7,609 tons of Concord grapes. By 1990 those figures had declined to 59 members producing 2,280 tons.

Plaintiffs state there was an understanding and an agreement that Welch would not close its facilities in Arkansas until Welch had tested and approved a method of transporting such grapes from the Missouri and Arkansas receiving points to another Welch processing plant. Plaintiffs

allege that the uncertainty created by the situation in this region resulted in a declining membership for this area. In September of 1991 National announced it had decided to close the Springdale plant entirely and terminate the membership and marketing agreements of all of its members in area 7.

The members were given a membership and marketing agreement termination and release form which when signed would constitute the member's withdrawal from National membership. The members were offered a settlement in lieu of other remedies. The settlement offer consisted of a net income component and a vineyard removal component.

Plaintiffs state they believe "their termination was not based on lack of raw product production, but rather on National's necessity to reduce the tonnage of grapes received by its members both for the purpose of increasing raw product prices and because of its lack of adequate storage facilities in which to store the admitted 'record' harvest of Concord grapes, and that National attempted to achieve that end by conspiring to defraud the Arkansas/Missouri growers by literal misrepresentation of their motives for termination from National's membership." *Complaint* para. 99. Plaintiffs assert various causes of action including 1) violations of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1–2; 2) violations of the Agricultural Fair Practices Act of 1967, 7 U.S.C. § 2303; 3) violations of the Securities and Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b); 4) breach of contract; 5) breach of fiduciary duty; 6) breach of duty to deal fairly and in good faith; 7) misrepresentation and/or constructive fraud; 8) the tort of outrage; and 9) negligence.

We have not attempted to set forth in any detail all the background information provided by the parties. Rather for purposes of discussion, the court has merely tried to relate in general the relationship between the parties and the events that gave rise to this lawsuit.

*Fiduciary Shield Doctrine.*

As noted above, the individual defendants have moved to dismiss the claims against them. Each of the individual defendants contends he is not subject to the personal jurisdiction of this court pursuant to Ark.Code Ann. § 16–4–101 (1987). The defendants argue that under the equitable fiduciary shield doctrine, jurisdiction over the individual officers and employees of a corporation may not be based upon the court's exercise of jurisdiction over the corporation itself. The individual defendants state that although they have all been physically present in Arkansas at various times in conjunction with the carrying out of their respective duties as corporate representatives, their visits to this state have been undertaken solely in a representative capacity.

In opposition plaintiffs point out that each defendant is charged with violations of the Securities and Exchange Act of 1934 and that the fiduciary shield doctrine does not apply to the federal securities claims. Plaintiffs refer the court to *Abeloff v. Barth,* 119 F.R.D. 315 (D.Mass.1988) in which the court noted the doctrine only applied in cases in which jurisdiction was asserted on the basis of a state long-arm statute. The *Abeloff* court further noted the doctrine had no application to causes of action under the securities laws. Additionally, plaintiffs argue that the fiduciary shield doctrine is only valid as long as no ultra vires acts have been committed by the parties seeking the protection of the doctrine. Plaintiffs argue that the individual defendants had much to gain for their own self-interest and personal advantage by closing the Springdale plant. Plaintiffs assert that the individual defendants exceeded their authority in taking actions that were illegal and self-serving.

■■■ Application of the fiduciary or corporate shield doctrine may arise in two separate contexts. First, it may arise as part of the court's jurisdictional analysis. Second, the doctrine may arise as a substantive rule of law. *See Byer v. Gordos Arkansas, Inc.,* 712 F.Supp. 149, 154 (W.D.Ark.1989). As a jurisdictional rule, the doctrine operates as an equitable limit on the exercise of personal jurisdiction.

In *National Precast Crypt Co. v. Dy-Core of Pa., Inc.*, 785 F.Supp. 1186 (W.D.Pa.1992) the court discussed the doctrine in the following terms:

> As a general rule, "[i]ndividuals performing acts in a state in their corporate capacity are not subject to the personal jurisdiction of the courts of that state for those acts." This rule is commonly referred to as the fiduciary shield doctrine. Several U.S. Courts of Appeals have concluded that the rule is a creature of statutory construction rather than a constitutional principle. As a result there are several exceptions to the rule.
>
> Courts will ignore the fiduciary shield rule in two circumstances, both of which have their roots in substantive legal theories that ignore the general corporate law rule of limited liability. First, a corporate agent may be held personally liable for torts committed in the corporate capacity. Accordingly, if the corporate officer engages in tortious conduct in his/her corporate capacity in the forum, courts will consider this conduct as contact with the forum sufficient to support a finding of personal jurisdiction over the officer in his/her individual capacity.
>
> Second, if the corporate officer is charged with violating a statutory scheme that provides for personal, as well as corporate liability, courts have held that contacts with the forum stemming from corporate actions should be considered when evaluating whether the officer, as an individual, has minimum contacts with the forum which would support the assertion of personal jurisdiction.

*Id.* at 1191. (citations omitted.).

In *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) and *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Supreme Court rejected the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. Such a rule is not mandated by the due process clause. *Id.* The Court noted, however, that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jur-

isdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary." *Keeton*, 465 U.S. at 781 n. 13, 104 S.Ct. at 1482 n. 13. "Each defendant's contacts with the forum State must be assessed individually." *Id.* Thus, *Calder* and *Keeton* indicate that the constitutional due process analysis must be applied to the contacts of each individual defendant. The existence of a state-created corporate form did not operate as a limitation on jurisdiction. *See Davis v. Metro Productions, Inc.*, 885 F.2d 515, 521 (9th Cir.1989); *Byer v. Gordos Arkansas, Inc.*, 712 F.Supp. 149, 155 (W.D.Ark.1989).

In view of *Calder* and *Keeton* the court believes it is necessary to utilize a case-by-case examination of the individual's contact with the forum. Relevant factors to be considered include: the nature, extent, and duration of the individual's contacts with the forum; whether the individual was acting in a representative capacity; the extent and nature of the corporate officer's personal participation in the alleged tortious conduct; the nature and quality of the officer's forum contacts; and the officer's role in the corporate structure. *See Rittenhouse & Lee v. Dollars & Sense, Inc.*, No. 83–5996, 1987 WL 9665 (E.D.Pa. Apr. 15, 1987).

The court believes the motion to dismiss must be denied. The plaintiffs have asserted various tort causes of action against the individual defendants. For the reasons stated below, the court does not believe defendants are entitled to summary judgment on all of these claims. Additionally, plaintiffs have at least alleged that the defendants acted in a ultra vires manner in performing these acts. Finally, the plaintiffs have asserted various federal causes of action to which the doctrine does not apply.

*Summary Judgment Standard.*

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines

for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir.1979), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The Court has recently reviewed the burdens of the respective parties in connection with a summary judgment motion. In *Counts v. M.K.–Ferguson Co.*, 862 F.2d 1338 (8th Cir.1988), the court stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, '[to] point[ ] out to the District Court,' I that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339, *quoting, City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.*, 883 F.2d 594, 598 (8th Cir.1989) (*citing Trnka v. Elanco Products*, 709 F.2d 1223 (8th Cir.1983).

*Breach of Fiduciary Duty.*

With regard to plaintiffs' breach of fiduciary duty claim, defendants contend that they owe no fiduciary duty to the plaintiffs on a personal basis. Rather, defendants contend that the duty is owed to the cooperative collectively as a whole.

The plaintiffs do not dispute this general statement of the law but point out that under the New York Cooperative Corporations Law the cooperative is given the general power to "act as an agent or representative of any member...." N.Y. Cooperative Corporations Law § 14 (Consol.1992). Additionally, plaintiffs point out that the parties have enjoyed a long-standing, continuous relationship far exceeding the traditional arms length contractual relationship. It is plaintiffs' contention that the acts of the defendants in terminating the area 7 memberships were beyond the scope of the defendants' authority, violative of the law, and were conducted in bad faith.

The New York law of business corporations applies to cooperatives formed under its provisions. A corporation does not stand in a fiduciary relationship with its shareholders. *State Teachers Retirement Board v. Fluor Corp.*, 566 F.Supp. 939, 941 (S.D.N.Y.1982). In *Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990) a case involving a cooperative housing project, the court held that the business judgment rule pertains to decisions of the officers and directors of cooperative corporations. The court noted that "the board owes its duty of loyalty to the cooperative—that is, it must act for the benefit of the residents collectively. So long as the board acts for the purposes of the cooperative, within the scope of its authority and in good faith, courts will not

substitute their judgment for the boards." *Levandusky*, 554 N.Y.S.2d at 812, 553 N.E.2d at 1322. It has also been noted that there is a duty to treat shareholders fairly and evenly. "This duty dictates that all corporate responsibilities be 'discharged in good faith and with conscientious fairness, morality and honesty in purpose....'" *Aronson v. Cary Crane, et al.*, 145 A.D.2d 455, 535 N.Y.S.2d 417 (1988). Whether the board appropriately discharged that duty, or acted unreasonably, is regarded as a question of fact. *Demas v. 325 West End Avenue Corp.*, 127 A.D.2d 476, 511 N.Y.S.2d 621 (1987).

At this point, the court believes the motion for summary judgment on this issue must be denied. Defendants may, of course, raise this issue again.

*Breach of Contract.*

Initially defendants point out that the only written contract is between the plaintiffs and National. This is, of course, correct. The written marketing agreements are between the individual plaintiffs and National. No contract exists between the plaintiffs and the other defendants.

Paragraph 11 of the standard membership and marketing agreement provides:

After this Agreement has been in effect for one harvest season, either party may stop the further transaction of business and the cooperative relationship as to future crops under it in any year as of the first day of August in that year by giving the other written notice during the month of March in that year, but this Agreement shall continue in force until such time with Member delivering the contracted crop. No deliveries may be made hereunder after the giving of such notice.

Paragraph 16 of the agreement provides:

This Agreement, along with the items and particulars referred to herein as they exist from time to time, constitute the only and entire agreement between the parties with respect to the subject matter hereof. There are no oral or other conditions, promises, agreements, representations or inducements in addition to or at variance with any of the terms hereof.

Paragraph 1 of the agreement provides:

Member hereby applies for and accepts membership in the Cooperative and agrees to conform his activities and relationship with the Cooperative to, and to observe and be bound by, this Agreement, Cooperative's Certificate of Incorporation and By-laws, and all rules, regulations, policies and resolutions adopted or established by or under the authority of Cooperative's Board of Directors (the "Board"), by whatever name described, which provide for the governance, operation or management of the affairs of the Cooperative or the conduct of its members, all as each may exist from time to time whether by revision, adoption, amendment or other action.

Defendants contend that under the clear and unambiguous terms of the agreement, National had the right to terminate the agreements. National argues that paragraph 11 gave it the right to terminate the agreements which it did by officially notifying plaintiffs in March of this year.

Plaintiffs concede that the language of paragraphs 11 and 16 is clear and may well be unambiguous. However, plaintiffs contend these paragraphs when read in conjunction with the other 16 paragraphs of the agreement did not even remotely give the defendants the unilateral right to expel the plaintiffs from membership in National. It is argued that the reciprocal rights and duties are stated in both the by-laws and the agreement and that the terms of the by-laws are incorporated by reference into the agreement. Plaintiffs refer the court to the language of paragraph nine which provides:

Cooperative's By-laws contain provisions for the termination of membership and this Agreement. A breach or violation of this Agreement is one of the grounds for termination of membership and cancellation of this Agreement by Cooperative. Such remedy does not exclude any other remedies allowed by law or equity.

Article I, section 4(c) of the by-laws entitled Expulsion from Membership provides:

The Board of Directors ... may expel a member from membership in the Association and terminate his membership and marketing agreement on proof that he has ceased to have qualifications requisite for membership in the Association....

*Plaintiffs' Exhibit 18.* This section further provides for notice and a hearing. Once these requirements are met the section states "[a] member shall be expelled and his membership and marketing agreement terminated on such vote and the sending of written notice thereof to such member during the month of March in any year." *Id.* Article I, section 1(a)–(b), of the by-laws sets forth the qualifications for admission to membership and for remaining a member. *Plaintiffs' Exhibit 18.*

Although not referred to by either side, the court notes Article I, section 4(a) provides that "[t]he Board of Directors may terminate marketing agreements on the terms set forth therein."

Plaintiffs also refer the court to a portion of a prospectus dated December 17, 1990. The section referred to describes the relationship between a grower and the company and makes the following statements regarding the termination of the agreements:

> After a Marketing Agreement has been in effect for one crop year, either party may stop the further transaction of business and the cooperative relationship as to future crops under it as of August 1 of any year by giving written notice to the other party during the month of March of that year. A Grower may terminate his Marketing Agreement for any reason.
>
> Under its By–Laws, National may terminate a Member's membership only if it finds that a member has: (a) ceased to be an actual producer of Concord or Niagara grapes with reference to the acreage contracted to National, (b) failed during a pressing season to deliver grapes contracted to National, (c) conducted himself in such a manner that National's Board of Directors finds his continued membership is not in National's best interests, (d) engaged in conduct which would violate any applicable cooperative corporation law, (e) used a pesticide in viticultural operations which is not approved for use on contracted grapes, (f) used the services of a mechanical harvester operator that is not approved by National for the harvesting or delivery of any of the contracted grapes, (g) delivered grapes to National from acreage which is not contracted to National, or (h) violated or failed to conduct his operations in conformity with the By–Laws of National or the policies of its Board of Directors as they exist from time to time and the provisions of any Membership or Marketing Agreement of the member with National. The By–Laws establish a procedure for affording a hearing to any member whose membership National Proposes to terminate.

*Plaintiffs' Exhibit 19 at pages 14–15.*

Plaintiffs argue that "[u]nder the clear and unambiguous terms of the Membership and Marketing Agreement executed by each of the plaintiffs, and as reinforced by the pronouncements contained in the Summary of Prospectus, the defendants *did not* have the right, authority, or power to terminate the plaintiffs' Agreements." It is contended that the association may only terminate the agreements if the member violates a rule or policy of the association or has ceased to have the requisite qualifications for membership.

Plaintiffs also state that the plaintiffs received letters entitled notice of termination of cooperative membership and marketing agreement in March of 1992 which according to plaintiffs was eight months after the members were expelled from the Association. Finally, plaintiffs argue that even assuming the expulsion was for a valid reason, the expulsion was nevertheless invalid because the members were not afforded the procedural protections specified in article I, section 4(c) of the by-laws.

■ Having carefully reviewed the materials submitted, the court concludes the defendant had the right to terminate the agreements in at least two different ways. First, pursuant to paragraph 11 of the marketing agreement the cooperative relationship as to future crops could be terminated.

*See also Plaintiffs' Exhibit 18, By–Laws, Article I, Section 4(a).* Second, pursuant to the by-laws the board of directors may by majority vote expel a member from membership. *Plaintiffs' Exhibit 18, By–Laws, Article I, Sections 4(b) and (c). See also* N.Y. Cooperative Corporations Law § 42 (Consol.1992) (forfeiture of membership upon proof the member has ceased to be engaged in the occupation or has ceased to have the qualifications requisite for membership). The court believes that termination pursuant to paragraph 11 of the agreement does not carry with it the procedural protections set forth in the by-laws for expulsion.

The exhibits submitted indicate the termination of the membership and marketing agreements was to become effective after the 1991 harvest season. *See e.g. Plaintiffs' Exhibit 13.* The area 7 members were apparently notified of National's intention to terminate the area 7 members as early as September of 1991. *Id.* A settlement offer was made to the area 7 growers which would be effective January, 1992. *See Plaintiffs' Exhibit 14.* Communications between National and the area 7 members continued until finally in March of 1992 the members who had not voluntarily accepted the settlement offer and termination were notified that pursuant to paragraph 11 of the marketing agreements the agreements were being terminated as of August 1, 1992. *See e.g. Plaintiffs' Exhibit 20.*

Plaintiffs have not referred the court to any provision in the marketing agreements or National's by-laws which would prohibit National from terminating all marketing contracts in a specified area. The court concludes that National had the power to and could terminate the marketing agreements by providing the appropriate notice. In this case it appears that National gave notice as early as September of the preceding year and then followed up with the March notice contemplated by the agreement.

*Misrepresentation and/or Constructive Fraud.*

Defendants argue that plaintiffs' claims for fraud are based primarily upon various statements made by representatives of National or Welch in the late 1970's and early 1980's concerning Welch's future operation of the Springdale plant and National's plans to continue receiving grapes from Arkansas and Missouri. As such, defendants contend the claims are barred by the applicable three year statute of limitations, Ark.Code Ann. § 16–56–106 (1987). Alternatively, defendants argue the plaintiffs have no evidence to support their cause of action for fraud on substantive grounds. Defendants refer the court to various cases which state that a fraud case may not be based on optimistic expressions of opinion about the future.

As defined by the Arkansas Supreme Court, common law fraud has five elements: (1) a false representation, usually of a material fact; (2) knowledge or belief by the defendant that the representation is false or that he lacks a sufficient basis of information to make the statement, that is, the scienter requirement; (3) intent to induce the plaintiff to act or to refrain from acting in reliance upon the representation; (4) justifiable reliance by the plaintiff upon the representation; and (5) resulting damage to the plaintiff. Howard W. Brill, *Arkansas Law of Damages* § 35–7 (2d Ed.1990). *See also McWilliams v. Zedlitz,* 294 Ark. 336, 338, 742 S.W.2d 929 (1988). "In general, an expression of opinion, i.e., a statement concerning a matter not susceptible of accurate knowledge, cannot furnish the basis for a cause of action for deceit or fraud. However, an expression of opinion that is false and known to be false at the time it is made is actionable. The general rule only applies where the person expressing his or her opinion does so in good faith." *Delta School of Commerce, Inc. v. Wood,* 298 Ark. 195, 199, 766 S.W.2d 424 (1989).

Under Arkansas law, a cause of action for fraud is governed by a three-year statute of limitations. Ark.Code Ann. § 16–56–105 (1985). *See also Burton v. Tribble,* 189 Ark. 58, 70 S.W.2d 503 (1934) (three year statute applies to all tort actions). "As to fraud or misrepresentation, mere ignorance of one's rights does not prevent the running of the statute of limitations or

laches, unless such ignorance is due to fraudulent concealment or misrepresentation on the part of those invoking the benefit of the statute. While an action for fraud must be brought within three years from the date the cause of action accrues, the fraud does suspend the running of the statute of limitations and the suspension remains in effect until the party having the cause of action discovered the fraud or should have discovered it by the exercise of reasonable diligence." *Dupree v. Twin City Bank*, 300 Ark. 188, 191–92. 777 S.W.2d 856 (1989) (citation omitted).

"[T]he test for the statute of limitations for fraud is not a subjective one, i.e. when the fraud was discovered or *should have been discovered . . . ." Id.* at 192 n. 2, 777 S.W.2d 856. The question that arises is whether the plaintiff used due diligence. *Talbot v. Jansen*, 294 Ark. 537, 744 S.W.2d 723 (1988). The burden is on the plaintiff to exercise due diligence to discover the fraud if apprised of facts which should place the plaintiff on notice. "Affirmative action on the part of the person charged with fraud to conceal a plaintiff's cause of action will toll the running of the statute of limitations." *Hughes v. McCann*, 13 Ark. App. 28, 31, 678 S.W.2d 784 (1984).

In opposition to the defendants' motion on this point, plaintiffs merely recite again for the court the laundry list of alleged misrepresentations contained within the complaint. Plaintiffs do not refer the court to any exhibits which establish any particulars regarding the alleged fraudulent statements. The plaintiffs submitted only the affidavits of Joe Bishop and Jim Stacy in which conclusory statements are made.[1] The affidavits do not give any particulars regarding who said what and when. It is incumbent upon the plaintiffs to make at least an evidentiary showing that an issue of fact exists. The plaintiffs generalized statements are insufficient to establish that the matters alleged are real and capable of being established upon trial. The motion for summary judgment on this issue will be granted.

*Breach of Duty to Deal Fairly and in Good Faith.*

Initially, defendants deny the applicability of section 1–203 of the Uniform Commercial Code which imposes a duty of good faith and fair dealing on parties to a contract. Defendants then reiterate their belief that National was well within its rights in terminating the marketing agreements and that plaintiffs have no evidence of bad faith on the part of National.

The Uniform Commercial Code places a general obligation of good faith on the parties to a contract. *See e.g.*, Ark. Code Ann. § 4–1–203 (1987). A similar obligation is recognized by the Restatement (Second) of Contracts § 205 (1981) and by New York law. *See e.g., Goodstein Construction Corp. v. The City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992); *Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.Y.S.2d 945, 549 N.E.2d 136 (1989). Thus whether or not the agreements at issue are governed by the Uniform Commercial Code, it appears that there is an implied covenant of good faith and fair dealing. A breach of this implied covenant would constitute a breach of contract.

In *Gallagher* the court stated "there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Id.* (74 N.Y.2d 562, 572, 549 N.Y.S.2d 945, 549 N.E.2d 136). "[T]he application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrange-

---

1. After the court's memorandum opinion had been prepared but before it was filed, the plaintiffs filed three more affidavits. The affidavits of George Piazza, Billie Paulsell, and Tony Min-go, are identical to the two affidavits previously filed and do not alter the court's ruling with respect to any of the claims.

ment." *Components Direct, Inc. v. European American Bank and Trust Co.*, 175 A.D.2d 227, 229, 572 N.Y.S.2d 359 (1991). The implied covenant of good faith does not negate a party's right to terminate a contract. "However absent valid business reasons precluding the [terminating party] from doing so, the obligation of good faith would require a period of notice to allow the [other party] a reasonable opportunity to [make other arrangements]." *Id.*

In *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987) the court in discussing the implied covenant of good faith in connection with an alleged breach of an employment contract noted that "a covenant of good faith can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract ... In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship...." *Id.* 514 N.Y.S.2d at 212, 506 N.E.2d at 922 (citations omitted).

Plaintiffs' allegations in this regard are the same as their allegations under the general breach of contract claim discussed *supra*. In view of this, the court believes the defendants are also entitled to the entry of summary judgment on this claim. The court has concluded that National had the right to terminate the agreements under paragraph 11 and that the required notice was given.

### Tort of Outrage.

To establish a claim for the tort of outrage, plaintiffs must demonstrate four elements: (1) the defendants intended to inflict emotional distress, or should have recognized emotional distress as a likely result; (2) the defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized community; (3) the defendants' actions caused anguish or distress to the plaintiffs; and (4) the emotional distress suffered was severe and of a type that no reasonable person should be expected to endure. Howard W. Brill, *Arkansas Law of Damages* § 35–11 (2d Ed.1990). The Arkansas Supreme Court has consis-

tently taken a narrow view of claims for the tort of outrage and has stated that the tort is not easily established and requires clear-cut proof. *Ross v. Patterson*, 307 Ark. 68, 70–71, 817 S.W.2d 418 (1991).

Plaintiffs assert that "[t]he actions of the defendants in undertaking and pursuing a course of conduct directed at the termination of the plaintiffs' farming operations and way of life were, not only sufficiently extreme in degree so as to be regarded as atrocious and intolerable in a civilized society, but additionally, caused the plaintiffs severe and justifiable emotional and physical distress which no reasonable person could be expected to endure." Having carefully reviewed the materials submitted and the allegations of the complaint, the court concludes that the defendants are entitled to judgment as a matter of law on this claim. The Arkansas Supreme Court has infrequently found actions sufficiently extreme and outrageous to establish this tort. The court does not believe the defendants' conduct can be said to be extreme, outrageous, and utterly intolerable in a civilized community.

### Negligence.

Essentially the defendants voice the same arguments with respect to this claim as they did in moving for summary judgment on the breach of fiduciary duty claim. In response, the plaintiffs also appear to treat the two separately pled causes of action as one. In fact, plaintiffs incorporate their earlier discussion. The court believes the two claims should be treated as one. As such, the court does not believe there is any need to separately discuss the claims and the parties are referred to the court's discussion *supra*.

### Violations of the Securities and Exchange Act of 1934.

In connection with the plaintiffs' securities claim, defendants argue that the membership and marketing agreements are not securities as defined by the Supreme Court in *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The defendants note that the agreements at issue are mere-

ly contracts by which the plaintiffs agreed to sell grapes to National. As such, defendants state the monetary compensation received by the plaintiff member is governed principally by the volume and quality of the grapes the individual member produced and delivered. Thus, it is the defendants' contention that a member's profits are derived from their own efforts in managing and operating his vineyard.

In opposition plaintiffs state that the acts of the defendants in procuring marketing agreements from the plaintiffs through the dissemination of false and misleading information in conjunction with their offering of securities to the plaintiffs violate section 10(b) of the Securities and Exchange Act. Plaintiffs after making this statement do not appear to argue in their brief that the marketing agreements are securities. Rather, plaintiffs in their brief argue that the allocation certificates, permanent equity capital credits and six-month and one-year notes are securities. Plaintiffs assert that all of these securities are paid for by the investor/grower out of proceeds withheld from his earnings.

■ In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) the Supreme Court held that those wishing to maintain a private action under Rule 10b–5 must have either bought or sold securities in connection with the alleged violation. SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, implements section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b). The rule makes it unlawful for any person to use "any device, scheme or artifice to defraud" or "[t]o make any untrue statement of material fact or to omit to state a material fact ... in connection with the purchase or sale of any security." In addition to showing such illegal acts or statements, individuals seeking recovery under the rule must show causation and scienter. Clearly, the plaintiff must establish that a security was bought or sold to state a cause of action under Rule 10b–5.

■ The classic test of what constitutes an investment contract for purposes of the Securities Act was set forth by the Supreme Court in *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey* the Supreme Court stated that an "investment contract for purposes of the Securities Act means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *Id.* at 298–99, 66 S.Ct. at 1103. A four part test has been derived from the *Howey* case. Under this test a security is 1) an investment 2) in a common venture 3) with a reasonable expectation of profits 4) to be derived from the entrepreneurial or managerial efforts of others. *Union Nat. Bank of Little Rock v. Farmers Bank*, 786 F.2d 881, 884 (8th Cir.1986).

The membership and marketing agreements provide that the member agrees to sell the grapes and National agrees to purchase the grapes. Paragraph 5 provides as follows:

Cooperative shall market the grapes delivered by Member through Welch, in whatever form, and, according to the terms of by-laws and marketing agreement with Welch, turn back to Member the proceeds of the sales of the Grapes, less operating and marketing expenses, on the basis of the quality and value provisions of Paragraph 6, and less also advances on account thereof and the amount of any lien or security interest thereon. Cooperative may effect retains or withholdings from net proceeds for such purposes and is such amounts as determined by Cooperative. The same shall be allocated to Member as provided in the By-laws, and allocation certificates, permanent equity credits and/or other written notices of allocation shall be issued thereon. The net proceeds paid to Member shall be received as settlement in full for all Grapes delivered.

*Plaintiffs' Exhibit 2.* Article IX of the by-laws sets forth the financial obligations of National to its members. In particular Article IX, section 1 provides:

*Patronage Funds.* This Association shall be so operated that the active patrons of the Association, members and non-members alike, will currently furnish money through their patronage to provide funds for the operating and other

capital uses of the Association, and for revolving the funds furnished in earlier years by patrons and others. In order to induce patronage and to assure that this Association will operate on a non-profit basis relative to all its transactions with its patrons, it is obligated to account on a patronage basis to all of its patrons ... for all amounts received on account of the sale or disposition of commodities furnished by them to the Association over and above the costs and expenses of the Association.... The Association is obligated to pay all such amounts to the patrons in cash, in Allocation Certificates or other evidences of indebtedness, or by credits to the account of the patron on the books of the Association, within eight and one-half months after the close of each fiscal year....

*Plaintiffs' Exhibit 18 at 20–21.*

 The court does not believe the marketing agreements themselves constitute investment contracts within the meaning of *Howey.* National is run for the mutual benefit of its members as producers not as investors. Advantages accrue to a member because of his patronage and not because of any financial investment he has made. *See e.g. Co-operative Grain and Supply Co. v. Commissioner,* 407 F.2d 1158, 1159 (8th Cir.1969). The agreements, however, encompass National's obligation to distribute net proceeds in the form of cash, allocation certificates, permanent equity capitol credits or notes to the members.

 To establish a 10b–5 violation the plaintiffs must show: 1) that the defendants used the mail or an instrumentality of interstate commerce in connection with the purchase or sale of securities; 2) that in connection with such purchase or sale, the defendants, either employed a device, scheme, or artifice to defraud, or made any untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements which were made, in light of the circumstances under which they were made, not misleading, or engaged in an act, practice or course of business which operated as a fraud or deceit upon any person in connection with the sale or purchase of a security; 3) that the defendants acted knowingly; 4)

that the plaintiffs justifiably relied upon the defendants' conduct; and 5) that the plaintiffs suffered damages as a result of defendants' conduct.

The alleged misstatements or omissions which plaintiffs contend they relied on dealt with the right of National to terminate the marketing agreements. Plaintiffs have not alleged any misstatements or omissions relative to the allocation certificates, capital equity credits, or notes. Plaintiffs merely assert that they relied on the statements contained within the prospectus and registration statements without specifying when they obtained this information.

From the material before the court, it does not appear that the plaintiffs will be able to establish a cause of action under 10b–5. However, the court cannot say that the defendants have met their burden of showing they are entitled to judgment as a matter of law on this point. In fact, defendants brief is limited to the issue of whether the marketing agreements themselves constitute securities. The defendants do not address the effect of the compensation plan.

*Agricultural Fair Practices Act.*

Plaintiffs allege that, in connection with National and Welch's decision to terminate the Area 7 growers' memberships, National, Welch and its agents or employees engaged in the following practices forbidden by the § 2303 of the Agricultural Fair Practices Act:

(a) The coercion and intimidation of the plaintiff/producers to cancel, or terminate membership agreements or marketing contract with an association of producers;

(b) the offer and inducement to a producer to refuse and cease to belong to an association of producers for the payment of money; and

(c) Welch's conspiracy with National to combine, agree, and arrange with other persons to do or abet the doing of any act made unlawful by the Agricultural Fair Practices Act of 1967.

*Plaintiffs' Amended Complaint, para. 42.* The defendants, in their motion for sum-

mary judgment, contend that (1) the Act is inapplicable to the facts and circumstances of this litigation, and (2) alternatively, the plaintiffs lack standing to bring suit since all termination settlements were voluntary and thus, no injuries have been suffered as a result of any prohibited conduct under this Act. Plaintiffs' response to this motion has illustrated, to the court's satisfaction, that a genuine issue of material fact exists as to whether the alleged actions on behalf of the defendants violated provisions of the Agricultural Fair Practices Act, and therefore summary judgment on this issue is unwarranted.

■ The federal Agricultural Fair Practices Act (AFPA) was enacted by Congress to protect the right of farmers and other producers of agricultural commodities to join cooperative associations through which to market their products. *See Michigan Canners & Freezers Assoc., Inc. v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 464, 104 S.Ct. 2518, 2520, 81 L.Ed.2d 399 (1984). Under section 1 of the Capper–Volstead Act, discussed more fully below, and section 6 of the Clayton Act, most activities of agricultural cooperatives were exempt from antitrust laws prior to passage of the AFPA, and thus, producers already had legal rights to form such associations. *Id.* However, the AFPA went further than either Act by protecting such producers from economic coercion. *Id.*

■ The Act "provides that it is unlawful for either a processor or producers' association to engage in practices that interfere with a producer's freedom to choose whether to bring his products to market himself or to sell them through a producers' cooperative association." *Id.* Section 2303 of the Act, thus, specifically provides, in pertinent part that

[i]t shall be unlawful for any handler[2] knowingly to engage or permit any employee or agent to engage in the following practices:

(a) To coerce any producer in the exercise of his right to join and belong or to refrain from joining or belonging to an

association of producers, or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or

\* \* \* \* \* \*

(c) To coerce or intimidate any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an association of producers or a contract with a handler; or

(d) To pay or loan money, give any thing of value, or offer any other inducement or reward to a producer for refusing to or ceasing to belong to an association of producers; or

\* \* \* \* \* \*

(f) To conspire, combine, agree or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by this chapter.

7 U.S.C. § 2303 (1988).

Plaintiffs have specifically alleged coercion and intimidation by defendants to obtain the cancellation or termination of plaintiffs' membership agreements and marketing contracts. Plaintiffs also contend that offers and monetary inducements were made by defendants, encouraging plaintiffs to cease to belong to the producers' association. These allegations, if proven to be true, involve the precise conduct Congress sought to ban with passage of the AFPA. The Act begins with a finding that "the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law." 7 U.S.C. § 2301 (1988). The Supreme Court has found that "in addition to forbidding various practices that could discourage producers from joining associations, the Act explicitly makes unlawful the coercion of a producer ... 'to refrain from joining or belonging to an association of producers....'" *Michigan Canners & Freezers,* 467 U.S. at 471, 104 S.Ct. at 2524.

§ 2302(a) (1988).

---

2. "Handlers" is defined to include both processors and producers' associations. 7 U.S.C.

The court believes that the plaintiffs have presented sufficient probative evidence to create a genuine issue of whether the defendants violated the provisions of the AFPA. After the board of National voted to terminate the Area 7 growers and close the Springdale plant in August of 1991, the growers received initial settlement offers for voluntary withdrawal from the association. Offers allegedly went back and forth until March of 1992, when involuntary termination letters were issued by National pursuant to paragraph 11 of the growers' marketing agreements.

Plaintiffs allege that defendants made the sale of the Springdale plant contingent upon receipt of 100% of the growers signed releases, and therefore, eliminated the growers' ability to press and store grapes until signing the release since the Welch facility is the only one of its type in the area. Plaintiffs further contend that the subsequent indemnification provision in the sales contract for the Springdale plant was included to intimidate the members, ensuring that members would not litigate their claims against Welch since, as shareholders, they would be responsible for indemnification in such a suit under the terms of the contract. Plaintiffs additionally allege that the defendants made intimidating phone calls and personal visits, sent intimidating letters and offered monetary awards to induce members to sign the releases. The plaintiffs' allegations, if believed by the trier of fact, could support a finding that, even if National properly terminated memberships in March of 1992, from September of 1991 until that time, National engaged in coercive and/or intimidating actions to force the plaintiffs to breach, cancel or otherwise terminate their marketing agreements with National.

Furthermore, defendants citation to *Alexander v. National Farmers Organization,* 687 F.2d 1173 (8th Cir.1982), in support of the statement that the AFPA is obviously inapplicable in this case, is erroneous. In *Alexander,* the court of appeals did not find that the Act was inapplicable. The court merely stated that nothing in the record would suggest that the district court's finding of no coercion was clearly erroneous. 687 F.2d at 1189. The defen-

dants' contention that plaintiffs' lack standing to bring this claim is also unfounded. Thus, the court finds that the defendants' motion for summary judgment with respect to the plaintiffs' AFPA claim is denied.

*Sherman Antitrust Act.*

Plaintiffs allege that actions taken on behalf of National and Welch constitute violations of the Sherman Antitrust Act. Specifically, plaintiffs contend that (1) National and Welch conspired to fix prices in violation of § 1 of the Act; (2) National and Welch attempted or conspired to monopolize interstate commerce and restrain trade in violation of § 2 of the Act and (3) National and Welch engaged in unlawful monopolization in violation of § 2 of the Act.

 a. Section 1 of the Sherman
 Antitrust Act.

Plaintiffs first assert that defendants violated Section 1 of the Sherman Antitrust Act, which states, in pertinent part, that

> [e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several states, ... is hereby declared illegal.

15 U.S.C. § 1 (1982). Not surprisingly, the courts of this circuit have required proof of two essential elements in any action under § 1: (1) a contract, combination, or conspiracy, which results in (2) an unreasonable restraint of trade. *Eureka Urethane, Inc. v. PBA, Inc.,* 746 F.Supp. 915 (E.D.Mo. 1990), *aff'd,* 935 F.2d 990 (8th Cir.1991).

Plaintiffs have pled specifically in paragraph 159 of their amended complaint that defendants National and Welch conspired to restrain trade and commerce by fixing prices in violation of Section 1. Defendants' motion for summary judgment contends that the plaintiffs have stated no cause of action under Section 1 since (1) Welch is the wholly owned subsidiary of National, and, therefore, cannot legally conspire with National in violation of Section 1, and (2) a corporation cannot conspire with its officers and employees in violation of Section 1. Plaintiffs response to the defendant's motion for summary judgment alleges that Mike Strictland, as president of Ozark Valley Products, a non-defendant, conspired with National and Welch, condi-

tioning the sale of the Springdale plant to the 100% exclusion of the plaintiffs from the cooperative in violation of antitrust laws.

 Before addressing the precise antitrust issues raised by the defendants' summary judgment motion, the court would dispose of any argument that actions taken on behalf of National and Welch are automatically immunized from antitrust litigation under the Capper–Volstead Act. *See* 7 U.S.C. § 291. The Capper–Volstead Act, correctly cited by the parties as providing a limited immunity from antitrust litigation to agricultural cooperatives, protects only actions of a cooperative which are within its "limited objectives." *See Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). Without determining whether the alleged actions of National and Welch exceeded the "limited objectives" of the cooperative, the court is aware of another problem with application of the Act which has not been raised by the parties.

In the Supreme Court case of *National Broiler Marketing Assoc. v. United States*, 436 U.S. 816, 827–29, 98 S.Ct. 2122, 2129–31, 56 L.Ed.2d 728 (1978), the Court used language suggesting that even one non-farmer member in a cooperative disqualifies a cooperative from claiming the Capper–Volstead exemption. *National Broiler* involved a marketing association of vertically integrated poultry producers. A number of the association's members, however, did not own or control breeder flocks, hatcheries or grow-out facilities but rather processed poultry. *Id.* at 822, 98 S.Ct. at 2127. The United States challenged the assertion by the association of a Capper–Volstead Act exemption, contending that these processors were middlemen and not "farmers." *Id.* at 826, 98 S.Ct. at 2129. The Supreme Court agreed, finding that Congress had not intended to exempt "even one" non-farmer under the Act. *Id.* at 826–828, 98 S.Ct. at 2129–30.

The Court's rationale in *National Broiler* was consistent with its earlier decision in *Case–Swayne Co., Inc. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967). There the Court denied the Capper–Volstead exemption to a

citrus growers association because approximately fifteen percent of its members were non-farmer producers. Thus, both cases make clear that "middlemen", if infiltrated into an otherwise exempt cooperative, are not to receive benefit of the Capper–Volstead exemption in antitrust litigation.

 In this case, there is no dispute that Welch, a wholly owned non-stock "cooperative" of National, is a non-farmer processor. The Court has made clear that when agricultural industries vertically integrate, including non-farmer middlemen such as processors, the economic role of these middlemen exceeds the conduct Congress intended to permit through the Capper–Volstead exemption. Thus, the court finds that while the exemption provides a limited immunity to farm cooperatives from antitrust litigation, the uncontested nature and relationship of National and Welch foreclose application of the Capper–Volstead exemption.

### 1. Contract, Combination or Conspiracy.

 The plaintiffs have alleged that National, Welch, and their agents and employees, as well as a possible third party, conspired to fix prices in violation of section 1 of the Sherman Antitrust Act. A conspiracy imports a plurality of persons acting in concert to attain a "common goal or purpose." *Eureka Urethane*, 746 F.Supp. at 930. Accordingly, the Supreme Court, in *Fisher v. City of Berkeley*, 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), recently reiterated that § 1 of the Sherman Act prohibits only unreasonable restraints of trade "effected by a 'contract, combination ..., or conspiracy' between *separate* entities." *Id.* at 266, 106 S.Ct. at 1049, quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (emphasis in original).

Thus, leaving aside for the moment any potential conspiracy involvement on behalf of a third party, this court must proceed to determine whether National, Welch and their agents and employees are separate entities for the purpose of a § 1 conspiracy.

The 1984 Supreme Court case of *Copperweld Corp. v. Independence Tube Corp.* is precisely on point. In *Copperweld,* the issue before the Court was whether the coordinated acts of a parent and its wholly owned subsidiary can, in the legal sense contemplated by § 1 of the Sherman Act, constitute a combination or conspiracy. The "intra-enterprise conspiracy" doctrine, recognized by the Court to have been derived from earlier Supreme Court decisions, had provided that § 1 liability was not foreclosed merely because a parent and its subsidiary are subject to common ownership.·

Recognizing that "[t]he Sherman Act contains a 'basic distinction between concerted and independent action,'" and that "the conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization," the Court proceeded to analyze whether a parent and subsidiary could act only in concert, thus giving rise to a § 2 action, or whether they could act independently or unilaterally, and thus providing a cause of action under only § 1 of the Act. The Court stated that "[t]he distinction between unilateral and concerted conduct is necessary for a proper understanding of the terms 'contract, combination ... or conspiracy' in § 1." *Id.* at 769, 104 S.Ct. at 2740.

■■■ The court then proceeded to address the nature of actions taken by corporate officers and employees, corporate divisions and subsidiaries. Finding that internal agreements and actions of corporate officers and employees pursuant to a single firm's policies do not raise the antitrust dangers which § 1 was designed to prevent, the court stated that

> [t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from a single effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively. For these reasons, officers or employees of the same firm

do not provide the plurality of actors imperative for a § 1 conspiracy.

*Id.* at 769, 104 S.Ct. at 2740–41. The Court likewise recognized that the conduct of an unincorporated division of a corporation was to be considered, for purposes of § 1, as the conduct of a single actor:

> The existence of an unincorporated division reflects no more than a firm's decision to adopt an organizational division of labor. A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself; a business enterprise establishes divisions to further its own interests in the most efficient manner. Because coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that warrants § 1 scrutiny.·

*Id.* at 770–71, 104 S.Ct. at 2741. The court then, for similar reasons, held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for the purposes of § 1 of the Sherman Act." *Id.* at 771, 104 S.Ct. at 2741. The court found that the parent and its subsidiary have a "complete unity of interest," with common objectives. *Id.*

> They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

> Indeed, the very notion of an "agreement" in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning. A § 1 agreement may be found when the "conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." [citation omitted]. But in reality a parent and a

wholly owned subsidiary *always* have a "unity of purpose or a common design."

\* \* \* \* \* \*

Because there is nothing inherently anti-competitive about a corporation's decision to create a subsidiary, the intra-enterprise conspiracy doctrine "imposes grave consequences upon organizational distinctions that are of *de minimis* meaning and effect." *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29 [82 S.Ct. 1130, 1135, 8 L.Ed.2d 305] (1962).

*Id.* at 771, 773, 104 S.Ct. at 2741–42, 2742–43. Thus, the Court held that while a corporation's initial acquisition of control is subject to scrutiny under § 1, thereafter, a corporation and its wholly owned subsidiary are fully subject only to § 2 of the Sherman Act and cannot conspire within the meaning of Section 1.

In accordance with *Copperweld*, the Eighth Circuit, in *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313 (8th Cir.1986), stating that "the economic substance between two entities determines whether they are separate for purposes of a section 1 conspiracy," likewise found a corporation and its wholly owned subsidiary incapable of a Section 1 conspiracy. *Id.* at 1316, citing *Copperweld, supra.*

However, in *Pink*, the Eighth Circuit recognized an exception to the general principle of *Copperweld* that agents of a corporation cannot conspire within the meaning of § 1:

When the interests of principal and agents diverge, and the agents at the time of the conspiracy are acting beyond the scope of their authority or for their own benefit rather than that of the principal, they may be legally capable of engaging in an antitrust conspiracy with their corporate principal.

*Id.* at 1317.

█ Though "no antitrust offense is more pernicious than price fixing," *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 434 n. 16, 110 S.Ct. 768, 781 n. 16, 107 L.Ed.2d 851 (1990), this court believes, consistent with the rationales of *Copperweld* and *Pink Supply*, that plaintiffs' section 1 price fixing action must fail for three reasons. First, it is undisputed that National, although an agricultural cooperative, is a New York corporation and Welch is its wholly owned subsidiary. Under New York law, there is no basis for treating an incorporated cooperative any differently than a ordinary corporation. *See Levandusky v. One Fifth Avenue Apt.*, 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990). Thus, in accordance with the cases cited above, National and Welch, as parent and wholly owned subsidiary, are considered to have a "unity of purpose or a common design;" the separate entity requirement of a section 1 conspiracy is missing and National and Welch are incapable of a section 1 conspiracy as a matter of law.

█ Second, the plaintiffs have failed to meet their burden with respect to the contention that National and Welch conspired with a third person, Mike Strictland of Ozark Valley Products, to foreclose competition and restrain trade in violation of Section 1. The court believes that this factually unsupported allegation, raised for the first time in response to the defendants' summary judgment motion, is without merit.

Pursuant to Rule 56(e), plaintiffs, as the non-moving party, may not "rest upon mere allegations or denials of the adverse party's pleadings," but rather are required to meet the defendants' motion for summary judgment "by affidavits and as otherwise provided ... set forth specific facts showing that there is a genuine issue for trial." Defendants have provided to the court excerpts of each of the plaintiffs' depositions which relate to their antitrust conspiracy allegations. While each plaintiff makes reference in his deposition to Orton, Baldwin and O'Donnell, alleging that the three agents of National engaged in a conspiracy to terminate the growers, there is not a single allegation in any of the depositions before the court that Mike Strictland was part of a conspiracy to restrain trade and foreclose competition, as was stated in the plaintiffs' response.

If the allegations implicating Mike Strictland have some basis in fact, the plaintiffs

have neglected to supply it to the court. Plaintiffs have failed to set forth any specific facts illustrating that there is a genuine issue regarding Mike Strictland's participation in a conspiracy with the defendants; no document or deposition now before the court supports the plaintiffs' theory. Furthermore, the plaintiffs' two identical and conclusory affidavits, presented to the court as supportive of their response to the motion for summary judgment, are unhelpful in establishing any particular facts indicating participation on behalf of Mike Strictland in a Sherman Act conspiracy. Rather, they state only that it is the affiant's *mere contention* that National and Welch conspired with Mike Strictland in violation of antitrust laws. Thus, the plaintiffs have failed to establish any significant probative evidence of a conspiracy or agreement in restraint of trade between Mike Strictland and the defendants.

 Third, the plaintiffs have presented no evidence that during the course of events the interests of Orton, Baldwin or O'Donnell, agents of National, diverged from the interests of National and Welch, enabling them to conspire with their principal. Though there is an exception to the general rule that agents of a corporation cannot conspire within the meaning of section 1 as a matter of law, plaintiffs have presented no disputed genuine issue of whether the exception, recognizing the possibility of a intracorporate conspiracy when agents are acting outside the scope of their employment, applies in this case.

While the plaintiffs have alleged that the agents of National were acting outside their scope of authority for purposes of the fiduciary shield doctrine, there has been no allegation that the agents were acting outside their scope of employment or for their own benefit for purposes of antitrust liability. In fact, the plaintiffs assert in both their complaint and amended complaint that the agents were acting within their scope of authority and these assertions are subsequently adopted in their antitrust claims.

The plaintiffs' response to the motion for summary judgment instead relies upon the unsubstantiated theory that the alleged antitrust conspiracy was between National and Mike Strictland, stating that

> the defendants have failed to recognize that the conspiracy to restrict competition was not merely between National/Welch and its agents and employees, nor was the conspiracy solely between National and its subsidiary Welch. Rather, the conspiracy complained of was between the defendants and Mike Strictland, as President of Ozark Valley Products.

Plaintiffs' Response to Defendants' Motion for Summary Judgment, p. 44. The plaintiffs fail to assert, however, that the agents were acting outside their scope of authority, and thereby capable of conspiring, and instead rely upon an alternative conspiracy theory found by the court to be without merit. The plaintiffs have not alleged that the *Pink Supply* exception applies, and thus, under these circumstances, the general rule that principals and agents cannot conspire within the meaning of section 1 governs.

The court finds, therefore, that (1) National, an incorporated cooperative, and Welch, its wholly owned subsidiary, are legally incapable of a § 1 Sherman Act conspiracy, (2) there is no genuine issue in dispute that anyone, including Mike Strictland, outside of National, Welch and its agents or employees, engaged in any concerted action to restrain trade or to fix prices, and (3) no evidence has been presented to the court which puts into dispute the issue of whether the agents or employees of National and Welch acted outside their scope of authority or for the benefit of themselves with respect to antitrust claims, in accordance with *Copperweld* and *Pink Supply*. The court holds, therefore, that the plaintiffs' claims under section 1 of the Sherman Antitrust Act must fail as a matter of law since there is no genuine issue of a conspiracy and summary judgment is granted on this claim.

b. Section 2 of the Sherman Antitrust Act.

The plaintiffs have also alleged violations of Section 2 of the Act. Section 2 of the Act subjects to prosecution

[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ...

15 U.S.C. § 2 (1988).

To establish monopolization in violation of § 2, the plaintiffs must show: "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* — U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966) (other citations omitted).

Monopoly power is defined as the "power to control prices and exclude competition with respect to a particular product and within a particular geographic market." *Eureka Urethane, Inc. v. PBA, Inc.,* 746 F.Supp. 915, 924 (E.D.Mo.1990), *aff'd,* 935 F.2d 990 (8th Cir.1991), citing *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Thus, to determine the existence of monopoly power, the Court must define the relevant market by reference to both the product market and the geographic market. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendants' products or services. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. at 377, 76 S.Ct. at 994. This comparative analysis has been characterized as the "reasonable interchangeability" standard. *Eureka Urethane,* 746 F.Supp. at 922.

Furthermore, a competitor may possess monopoly power in a submarket. A market can be divided into submarkets and may be determined by examining (1) the industry or public recognition of the submarket as a separate economic entity;

(2) the product's peculiar characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes and (7) specialized vendors. *Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. at 1523.

However, a mere showing of monopoly power in the relevant market, unaccompanied by evidence of anti-competitive behavior, is insufficient to support a claim for monopolization. *Trace X Chemical, Inc. v. Canadian Industries, Ltd.,* 738 F.2d 261 at 266 (8th Cir.1984). Thus, the second element of a section 2 claim requires proof of "either (1) specific intent to monopolize or (2) anticompetitive effects that result from the monopolist's actions." *Paschall v. Kansas City Star Co.,* 727 F.2d 692, 696 (8th Cir.1984), *cert. denied,* 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984), citing *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). One need not prove both specific intent and anticompetitive effects; either alone is sufficient basis for the imposition of liability for an actor possessing monopoly power. *Id.* However, liability based upon specific intent may be negated where valid business justifications exist for the monopolist's actions. *Id.* at 697.

Anti-competitive conduct is conduct without a legitimate business purpose. *Becker v. Egypt News Co.,* 713 F.2d 363, 366 (8th Cir.1983). Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2. *Telex Corp. v. IBM,* 510 F.2d 894, 925–26 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975):

The exercise of business judgment cannot be found to be anti-competitive. To be labeled anti-competitive, the conduct involved must be such that its "anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power."

*Trace X Chemical,* 738 F.2d at 266. Rather, acts which would constitute an unlawful use of monopoly power are those "derived

from [the monopolist's] power in the market or its size, ... acts which could have been performed by one with the requisite power." *Id.* at 266, citing *Telex Corp. v. IBM*, 510 F.2d 894, 926 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

Plaintiffs' section 2 monopolization claim must fail for reasons which become apparent after examination of the record. As stated above, proof of monopoly power in the relevant geographic and product markets is essential to the establishment of all section 2 claims. While the court does not doubt for one moment that National and Welch are powerful players in the grape and related product industry, the plaintiffs have entirely neglected to present any probative evidence on the issues of monopoly power, the geographic and product markets or the defendants' share of those markets. Plaintiffs have presented no evidence that National possesses the "power to control prices and exclude competition with respect to a particular product and within a particular geographic market," the requisite monopoly power for establishment of a monopolization violation in this circuit. Any assertion made on behalf of the plaintiffs as to National's position in the market is nothing more than conclusory and unsubstantiated, and as such, is clearly insufficient to overcome a motion for summary judgment on this issue. Since no genuine issue of fact remains for trial with respect to the plaintiffs' section 2 monopolization claim, the court grants summary judgment for the defendants on plaintiffs' section 2 monopolization claim.

Plaintiffs also allege that defendants conspired to monopolize or attempted to monopolize commerce and trade under section 2 of the Act and have the burden of proving the following elements: (1) defendants' specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anti-competitive conduct on behalf of defendants directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *See Trace X. Chemical*, 738 F.2d at 265. An antitrust plaintiff, alleging an attempted monopolization, must prove the existence of "methods, means and practices which would, if successful, accomplish monopolization, and which, falling short, nevertheless approach so close as to create a dangerous probability of it...." *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946).

In the Eighth Circuit, it is necessary that "a minimal showing must ... be made as to the product and geographic context of the alleged conspiracy" in a Section 2 conspiracy to monopolize claim. *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1993 (8th Cir.), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1982). Once again, however, the plaintiffs have failed to submit to the court any relevant, probative evidence which helps to define the relevant product and geographic markets and National's share of those markets. Furthermore, the plaintiffs have neglected to produce evidence creating a genuine issue on any of the following: (1) that National intended to destroy competition in the marketplace; (2) that termination of the growers was a predatory or anticompetitive market practice; or (3) that National maintains the necessary share of the grape market to support the contention that "a dangerous probability of success in monopolization of the market" exists. Any allegations of this type made by the plaintiffs have been conclusory and unsubstantiated by the record. Thus, the plaintiffs also have failed to illustrate a genuine issue of material fact for trial on their conspiracy to monopolize or attempt to monopolize claim under section 2 and summary judgment for the defendants is also granted on these claims.

A separate order in accordance herewith will be concurrently entered.